**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| TIEMOKO COULIBALY, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 14-0189 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 30, 36, 39 |
| | : | | |
| JOHN KERRY, *U.S. Secretary of State, et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT;
DENYING PLAINTIFF'S MOTION FOR LEAVE TO FILE FOURTH AMENDED COMPLAINT;
GRANTING PLAINTIFF'S MOTION TO ADD NEWLY ACQUIRED EVIDENCE

## I. INTRODUCTION

Plaintiff Dr. Tiemoko Coulibaly, proceeding *pro se* and *in forma pauperis*, brings this

action against the United States, the Secretary of State, and twelve other individuals who are

current or former employees of the U.S. Department of State, the Merit Systems Protection

Board ("MSPB"), or the Equal Employment Opportunity Commission ("EEOC"). In a

twenty-two count complaint, Dr. Coulibaly alleges discrimination, retaliation, First Amendment

violations, common law tort contract violations, and violations of various federal and District of

Columbia statutes. Currently pending before the Court are (1) Defendants' pre-discovery motion

to dismiss or, in the alternative, for summary judgment; (2) Dr. Coulibaly's motion for leave to

file a fourth amended complaint; and (3) Dr. Coulibaly's motion to add newly acquired evidence.

For reasons discussed in this opinion, the Court dismisses or grants summary judgment to

Defendants on all of Dr. Coulibaly's claims asserted in his third amended complaint, with the

exception of his First Amendment claim based on 2007 events (asserted in Count 5 of his

complaint), as asserted against individual defendants; his Title VII hostile work environment claim (Count 6); his wrongful discharge claim (Count 13); and his claim of retaliation based on 2009 events (asserted in Count 16).  As explained below, the individual defendants must be served so that they may respond to Count 5, and genuine disputes of material fact exist on the other three counts, which the parties should explore during discovery.  The Court will accordingly deny Defendants' motion with respect to these four counts.

Dr. Coulibaly's proposed fourth amended complaint reasserts many claims from his third amended complaint (including many that, as discussed below, must be dismissed). And many of Dr. Coulibaly's proposed additional claims are factually unrelated and legally distinct from the ones in his third amended complaint, such that allowing consideration of them here would unnecessarily delay this case's progress.  The Court will therefore deny Dr. Coulibaly's motion for leave to file a fourth amended complaint.  Lastly, because Defendants consent to Dr. Coulibaly's motion to add newly acquired evidence, the Court will grant that motion.

## II.  FACTUAL BACKGROUND[1]

### A.  Employment as an FSI Contractor (1999–2011)

#### 1.  Employment Status

Dr. Coulibaly is an African American from the Ivory Coast.  Pl.'s Third Am. Compl. ("Compl.") ¶ 19, ECF No. 28.  In 1999, Dr. Coulibaly joined the Department of State's Foreign

---

[1] At the motion-to-dismiss stage, the Court presumes that the plaintiff's factual allegations in the complaint are true.  *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).  When citing to documents outside of the pleadings, the Court views the evidence in the light most favorable to Dr. Coulibaly.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (explaining that, in the summary judgment context, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor").  The Court cites to Defendants' statement of material facts when Defendants' version of the facts agrees with Dr. Coulibaly's.

Service Institute ("FSI") as a French instructor. *Id.* FSI originally hired him as a contractor

under a series of Blanket Purchase Agreements ("BPAs"). *See id.* ¶ 119; Defs.' Statement of

Material Facts as to Which There Is No Genuine Dispute ("Defs.' Facts") ¶¶ 1−3, ECF No. 30.

During this time, to stay employed as an FSI contractor each year, Dr. Coulibaly had to ensure

that FSI would renew his contract. *See* Compl. ¶¶ 74−75. When he started working at FSI,

Dr. Coulibaly reports that Dr. Jane Kamide was the head of the French section, and that Solomon

Atayi served as her deputy. *Id.* ¶ 70.

## 2. Discussions About Political Statements

Later during Dr. Coulibaly's time as an FSI contractor, Solomon Atayi served as head of

the French section and as Dr. Coulibaly's supervisor. Compl. ¶¶ 21, 54, 65. According to

Dr. Coulibaly's complaint, Mr. Atayi is an African American from Togo. *Id.* ¶¶ 21, 55.

Dr. Coulibaly asserts that, after Mr. Atayi learned that Dr. Coulibaly had been giving statements

to the media about political events occurring in the Ivory Coast, Mr. Atayi told Dr. Coulibaly

that he had "no right to give interviews to radio, TV, [or] newspapers on his country of origin"

---

Defendants argue that, in violation of this Court's local rule, Dr. Coulibaly did not submit a "separate concise statement of genuine issues setting forth all material facts as to which . . . there exists a genuine issue necessary to be litigated," and so Defendants' own statement of material facts "should be deemed admitted." Defs.' Reply Pl.'s Opp'n Defs.' Mot. Dismiss or, in the Alt., for Summ. J. ("Defs.' Reply") at 5−6, ECF No. 42 (quoting D.D.C. Civ. R. 7(h)(1)).

In his opposition brief, however, Dr. Coulibaly does list a series of facts that he titles "Statement of Undisputed Material Facts Established by the Agency's Official Extensive EEO Report of Investigation (ROI) as to Which There Is No Genuine Dispute . . . ." Mot. Leave Pl.'s Fourth Am. Compl. & Pl.'s Resp. Gov't Mot. Dismiss or in the Alt. Summ. J. ("Pl.'s Resp.") at 118, ECF No. 36-1. And, while disorganized and quite repetitive, Dr. Coulibaly's statement of facts does attempt to cite facts gleaned from various exhibits that he attached to his opposition brief. *See, e.g.*, Pl.'s Resp. ¶¶ 237, 244, 256. Because Dr. Coulibaly's statement thus loosely complies with Local Civil Rule 7(h)(1), the Court declines to deem Defendants' statement of facts admitted. *See generally* D.D.C. Civ. R. 7(h)(1) (requiring briefs opposing summary judgment to include merely "a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement").

because Dr. Coulibaly was an employee of the Department of State.  *Id.* ¶¶ 65–66.  Dr. Coulibaly also asserts that Mr. Atayi further told Dr. Coulibaly that, even though Dr. Coulibaly was in line to become a "direct-hire" FSI employee, Mr. Atayi believed that hiring Dr. Coulibaly was "not a good idea" because of Dr. Coulibaly's "political articles against the Ivorian government."  *Id.* ¶ 54.  Along those lines, Mr. Atayi allegedly stated that appointing Dr. Coulibaly as an employee "could create political problems" between the Department of State and the Ivory Coast.  *Id.*

Dr. Coulibaly further asserts that Mr. Atayi's supervisor, "Micha," who Dr. Coulibaly reports is white, also took Mr. Atayi's views.  *See id.* ¶ 57.  In a conversation with Dr. Coulibaly, Micha allegedly told Dr. Coulibaly that "it [was] not a good idea to hire him as [an] employee" because Dr. Coulibaly "was a political asylee" in the United States and because "his writing could also create some political problems."  *Id.*  Dr. Coulibaly states that, in support of her statement, Micha alluded to a past incident in which "an individual working for [the] State Department was also [a] political [a]sylee" and in which "his speech against the [g]overnment of his country created some political tensions" between the United States and that individual's country of origin.  *Id.*

Dr. Coulibaly contends that he responded to Mr. Atayi's directives about Dr. Coulibaly's political statements by explaining that, because of his contractor status, Dr. Coulibaly "was free to give interviews after his work at FSI . . . because there was no rule or policy preventing him [from] do[ing] that."  *Id.* ¶ 66.  He further explained that he "never mentioned his work at [the] State Department in any of his interviews or article[s]."  *Id.* ¶ 67.  In response to Micha's comments, Dr. Coulibaly states that he noted how "he ha[d] been working since 1999 for [the] State Department as [a] contractor" and how his statements outside of work had "never created any political tension" between the United States and the Ivory Coast.  *Id.* ¶ 58.  Dr. Coulibaly

also states that Mr. Atayi later "admitted that [Dr. Coulibaly] was right" about his ability to make political statements if he did not mention his work at the Department of State. *Id.* ¶ 67.

### 3.  Efforts to Become an FSI Employee

Concurrently with Dr. Coulibaly's discussions with Mr. Atayi and Micha, Dr. Coulibaly alleges that FSI was preparing to hire him as an employee—but that Mr. Atayi ruined Dr. Coulibaly's chances. *See* Compl. ¶¶ 54–67, 79–80.  Dr. Coulibaly alleges that, in 2007, FSI's "hiring of teachers was based on seniority." *Id.* ¶ 50 (emphasis omitted).  For that reason, Dr. Coulibaly contends that "it was his turn to become [a] direct-hire [employee]" in 2007. *Id.* In support, Dr. Coulibaly asserts that FSI's Associate Dean James North asked Dr. Coulibaly if he would accept a direct-hire position, and that Dr. Coulibaly responded in the affirmative. *Id.* ¶¶ 50–51.  Dr. Coulibaly therefore "expecte[d] his appointment by Associate Dean James North sometime[] soon after this conversation." *Id.* ¶ 51.

Indeed, the record indicates that, on June 15, 2007, the FSI human resources department created the position description for a French language teaching position, which at some point in 2007 or thereafter had Dr. Coulibaly's name on it. *See id.* ¶¶ 41–43; Duckett Decl. ¶¶ 1–2, Defs.' Facts Ex. Z, ECF No. 30-26; Position Description, Defs.' Facts Ex. F, ECF No. 30-6 (reproducing the position description, which was signed by both Associate Dean North and an FSI human resources officer on June 15, 2007).  But Dr. Coulibaly did not become an FSI employee until 2011. *See* Compl. ¶¶ 43, 80; Defs.' Facts ¶ 4.  To justify the gap in time, an FSI human resources officer explains that the position description "was classified" on June 15, 2007—meaning that it was a "standard" position description to which other individuals besides Dr. Coulibaly could also have been assigned. *See* Compl. ¶¶ 41, 44; Duckett Decl. ¶ 2.  Thus, she states, "[u]pon [Dr.] Coulibaly's appointment in 2011, a copy of the Position Description

was made and [Dr.] Coulibaly's name was written into Box 17," which FSI originally left blank. Duckett Decl. ¶¶ 3, 5; *see* Position Description (showing Dr. Coulibaly's name in Box 17).

Dr. Coulibaly disputes FSI's explanation.  *See* Compl. ¶¶ 42–54, 79–80.  He points to what he views to be several flaws in the explanation: (1) both Associate Dean North and the FSI human resources officer had already signed the position description on June 15, 2007, *id.* ¶ 43; (2) other FSI employees did not have the date June 15, 2007 in their hiring documents and had never heard of the practice of copying a position description, *id.*; and (3) Dr. Coulibaly never received the June 15, 2007 position description when Dr. Coulibaly became an FSI employee in 2011, which he views as evidence of "active concealment and intentional non-disclosure," *id.* ¶¶ 47, 51.

Rejecting FSI's explanation, Dr. Coulibaly posits a different explanation for the gap in time between the 2007 date of the position description and his 2011 appointment as an FSI employee.  *See id.* ¶¶ 54–67, 79–80.  Dr. Coulibaly claims that his supervisor, Mr. Atayi, used Dr. Coulibaly's political statements as a pretext to hire another employee in Dr. Coulibaly's stead.  *See id.* ¶¶ 55, 62–68, 79–80; *see supra* Part II.A.2 (discussing Dr. Coulibaly's conversations with Mr. Atayi about political statements that Dr. Coulibaly made in his private capacity).  According to Dr. Coulibaly, Mr. Atayi "wanted to hire as soon as possible another teacher," Frederic Hegbe, who shared Mr. Atayi's country of origin (Togo).  Compl. ¶ 55.  Because Mr. Hegbe purportedly possessed less seniority, less experience, and less education than Dr. Coulibaly, Mr. Atayi had to "obstruct[] . . . [Dr. Coulibaly's] appointment by using pretext[ual reasons]."  *Id*.  Dr. Coulibaly contends that, to that end, Mr. Atayi "avoided presenting" Dr. Coulibaly with the June 15, 2007 position description because he knew that Dr. Coulibaly was expecting the appointment and "would have accepted the hiring."  *Id.* ¶ 64.

6

Dr. Coulibaly buttresses his claims of wrongdoing on Mr. Atayi's part by detailing ways in which Mr. Atayi allegedly created a "hostile work environment," perhaps because he was envious of Dr. Coulibaly's education and communications with journalists. *See id.* ¶¶ 54, 65, 68, 73–75. According to Dr. Coulibaly, Mr. Atayi would "constantly call [Dr. Coulibaly] to order him to go buy [Mr. Atayi's] monthly parking permit . . . , just to show he was the boss." *Id.* ¶ 74. Dr. Coulibaly further alleges that Mr. Atayi made him beg for his contract renewal each year. *Id.* ¶¶ 74–75. And Mr. Atayi had purportedly told him that "if [he] want[ed] to be [a] direct hire, [he] just need[ed] to have an affair with Dr. Jane Kamide," the head of FSI's French section before Mr. Atayi. *Id.* ¶ 73.

#### 4.  Alleged Workplace Violence

Dr. Coulibaly alleges that two years later, on March 26, 2009, he was "a victim of workplace violence." Notice of Right to File a Discrimination Complaint ¶ 3, Defs.' Facts Ex. JJ, ECF No. 30-36 (describing Dr. Coulibaly's allegation); *see also* Compl. ¶ 158; Notice of Dismissed Allegations, Defs.' Facts Ex. II, at 6, ECF No. 30-35.[2] He claims that, after he informed his then-supervisors about the incident, "[t]hey ignored his claim and did nothing." Notice of Right to File a Discrimination Complaint ¶ 3. Dr. Coulibaly allegedly then "went to Diplomatic Security" to report the incident, but also received no redress from that source: another FSI manager, Debra Blake, purportedly told him that "this investigation must be closed." *Id.* (internal quotation mark omitted).

Although Ms. Blake allegedly assured Dr. Coulibaly that "there [would] be no retaliation" against him, Dr. Coulibaly claims that he felt "hostility" against him on the part of

---

[2] Because the pagination of Defendants' Exhibit II does not run consecutively, the Court cites to the page numbers automatically generated by ECF.

FSI management.  *Id.*  Indeed, Dr. Coulibaly claims that Ms. Blake told him that "he was lucky he didn't lose his job after contacting Diplomatic Security," "warned him to not file [any more] complaint[s] against [FSI] management," and said that, if he did, "he would lose his job." Compl. ¶ 161.  Accordingly, Dr. Coulibaly claims that "was not aware of his rights and was in fear of [losing] his job," so he did not timely bring the workplace violence incident—which he later alleged to be discriminatory—to the attention of the Department of State's Office of Civil Rights.  *Id.*; *see* Notice of Dismissed Allegations, at 6–7, ECF No. 30-35 (dismissing Dr. Coulibaly's 2009 allegations, which he later asserted before the Office of Civil Rights, because he did not bring them "within 45 calendar days from the date of the matter alleged to be discriminatory").

### 5.   Further Efforts to Become an FSI Employee

Dr. Coulibaly believes that, because he contacted Diplomatic Security, FSI declined to hire him as an employee in June 2009, even though he was "clearly the best candidate."  Notice of Right to File a Discrimination Complaint ¶ 3; *see also* Compl. ¶ 158.  He further contends that, at the end of the 2009 hiring process, FSI was considering "two candidates for two position[s]."  Compl. ¶ 158.  He reports that, even though Dr. Coulibaly was one of the candidates, FSI hired only the other candidate, who had "less education and less training"; FSI "decided to close the other position" and declined to hire Dr. Coulibaly.  *Id.*  As with the workplace violence incident, Dr. Coulibaly later claimed that FSI's failure to hire him was discriminatory, but he claims that he did not timely bring the failure to hire to the attention of the Office of Civil Rights because he "was in fear of [losing] his job."  Compl. ¶ 161; *see* Notice of Dismissed Allegations, at 6–7, ECF No. 30-35 (dismissing both of Dr. Coulibaly's allegations arising from 2009 events).

**B.  Employment as an FSI Employee (2011-2012)**

1.  Employment Status

On June 19, 2011, FSI at last hired Dr. Coulibaly as an employee.  *See* Compl. ¶¶ 46,

121; Notification of Personnel Action, Defs.' Facts Ex. C, ECF No. 30-3 (showing that

Dr. Coulibaly began working as a Department of State employee on June 19, 2011).

Dr. Coulibaly's appointment as an employee was for a term of two years, which included a

one-year trial period.  *See* Notification of Personnel Action (noting Dr. Coulibaly's temporary

appointment and one-year trial period); Statement of Understanding, Defs.' Facts Ex. E, ECF

No. 30-5 (noting Dr. Coulibaly's two-year appointment).  Upon his hire, Dr. Coulibaly signed a

statement of understanding, thereby accepting that he could "be terminated at any time

depending on the needs of the [Department of State]."  *See* Statement of Understanding.

As a Language and Culture Instructor (or, officially, a "Training Instructor"),

Dr. Coulibaly's major duties included "teaching speaking, reading, listening comprehension and

writing . . . skills to a full range of students" and "provid[ing] major substantive input for the

planning, design, development and evaluation of the course content."  Position Description,

Defs.' Facts Ex. F, at 3–4, ECF No. 30-6.[3]  During Dr. Coulibaly's employment at FSI, as

before, James North served as FSI's Associate Dean.  *See* North Aff. ¶¶ Q1, Q3, Defs.' Facts

Ex. G, ECF No. 30-7.  When Dr. Coulibaly first began working as an employee, Language

Training Supervisor (LTS) Laura Fyfe, who is white and from the United States, served as

Dr. Coulibaly's first-line supervisor.  *See* Fyfe Aff. ¶¶ Q1, Q3–Q6, Q46, Defs.' Facts Ex. H, ECF

No. 30-8.  Starting in January 2012, LTS Phillipe Casteuble, who is white and from France,

---

[3] Because the Position Description is not consecutively paginated throughout, the Court cites to the page numbers automatically generated by ECF.

served as Dr. Coulibaly's new first-line supervisor.  *See* Casteuble Aff. ¶¶ Q1, Q3–Q6, Defs.'

Facts Ex. J, ECF No. 30-10.

2.  Alleged Preferential Treatment Toward Colleague

The same day that Dr. Coulibaly began working as an FSI employee, he alleges that FSI

also hired Aitmouloud Ahmed Hmimiche, who Dr. Coulibaly asserts was FSI Division Director

Debra Blake's "boyfriend."  Compl. ¶ 121.[4]  Dr. Coulibaly alleges that he complained about

favoritism that FSI showed toward Mr. Hmimiche, but that his action resulted in Director Blake

becoming "mad" and "very agitated."  *Id.*  Dr. Coulibaly contends that Director Blake's

emotional response was a motive for later retaliation and adverse actions taken against

Dr. Coulibaly.  *See id.*

Other employees in FSI's French section shared Dr. Coulibaly's views about Director

Blake and Mr. Hmimiche. For instance, another French teacher, Paulette De Launay-Fogg,

exactly corroborated Dr. Coulibaly's views.  *See* EEO Investigation Report at 34–35, ECF

No. 36-3 (summarizing the affidavit that Ms. De Launay-Fogg completed for the EEO

investigation);[5] *see also* De Launay-Fogg Aff., EEO Investigation Report at 1374–76, *Coulibaly*

*v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-12 (reproducing Ms. De Launay-

Fogg's affidavit).[6]  She states that Dr. Coulibaly and Mr. Hmimiche became employees on the

---

[4] The Court uses the written name for Mr. Hmimiche that Dr. Coulibaly uses in his complaint.  *See* Compl. ¶ 121.

[5] Because the initial exhibits appended to Dr. Coulibaly's opposition brief are not consecutively paginated, the Court also includes the page number automatically generated by ECF.

[6] In Dr. Coulibaly's related case before this Court, defendants in that case have filed the complete EEO Investigation Report generated in response to Dr. Coulibaly's December 20, 2011 allegations.  *Compare* EEO Investigation Report, ECF Nos. 36-3, 36-4 (reproducing just pages 1–227 and 742–970 of the report), *with* EEO Investigation Report, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF Nos. 26-1 to -12 (reproducing the entire 1418-page report).  The Court takes judicial notice of publicly filed documents in related litigation.  *See*

same day, but that they "were treated very differently." De Launay-Fogg Aff. ¶ Q6, EEO

Investigation Report at 1375. Mr. Himiche's preferential treatment, she asserted, arose from the

fact that he and Director Blake were a "couple," a fact that Ms. De Launay-Fogg contends was

"common knowledge" at FSI. *Id.* She asserts that she saw Director Blake "caressing"

Mr. Hmimiche's neck, that Mr. Hmimiche was "always running into [Director Blake's] office,"

and that "[m]any times, they were seen . . . leaving the school together." *Id.*

Likewise, learning consultant Fatima Smith stated that "it was evident that [Director]

Blake had developed an intimate and seemingly romantic relationship with Mr. Hmimiche" and

that Mr. Hmimiche "clear[ly] received preferential treatment from [Director] Blake and [LTS]

Fyfe." Smith Aff. ¶ Q6, EEO Investigation Report at 1365, *Coulibaly v. Kerry*, No. 14-0712

(D.D.C. Mar. 4, 2016), ECF No. 26-12. Ms. Smith emphasized how Mr. Hmimiche's

qualifications were inferior to Dr. Coulibaly's: "Whereas Dr[.] Coulibaly is highly qualified with

a Ph[.D] and . . . is a seasoned French language teacher with many many years of experience,

Mr. Hmimiche does not have the education or the teaching experience comparable to Dr[.]

Coulibaly's." *Id.* Yet, Ms. Smith observed, "Mr. Hmimiche's teaching approach was never

questioned by either [LTS] Fyfe or [Director] Blake," and Mr. Hmimiche later received tenure as

an FSI instructor. *Id.*

Evidence indicates that, at one point, Dr. Coulibaly complained to LTS Fyfe about a

change in his teaching schedule and accused FSI management of changing the schedule to

accommodate Mr. Hmimiche. *See* Lauterbach Aff. ¶ Q6, EEO Investigation Report at 1360,

*Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-12 (discussing an email

---

*Lewis v. Drug Enf't Admin.*, 777 F. Supp. 2d 151, 159 (D.D.C. 2011) (citing *Covad Commc'ns
Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005)) ("The court may take judicial
notice of public records from other court proceedings.").

LTS Fyfe sent in response to the complaint).  And Dr. Coulibaly's former colleague, language instructor Marie-Paule Lauterbach, shared an office space with him and asserts that she saw an email in which LTS Fyfe responded to Dr. Coulibaly's complaint and criticized him by calling him by the pejorative term "bean counter." *Id.* ¶¶ Q1, Q6, EEO Investigation Report at 1359–60. The email was supposedly "recalled almost immediately after [Dr. Coulibaly] had received it and after he had shown it to [Ms. Lauterbach]." *Id.*

### 3. Conflict with Supervisor Laura Fyfe

Meanwhile, Dr. Coulibaly and his initial FSI supervisor, LTS Fyfe, began to experience conflict over expectations for Dr. Coulibaly's job responsibilities.  LTS Fyfe recounts that, after establishing Dr. Coulibaly's "work commitments" on June 20, 2011, she met with Dr. Coulibaly on July 8, 2011 for a performance discussion.  Email from Laura Fyfe (Nov. 7, 2011), EEO Investigation Report at 721, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-7.  LTS Fyfe states that, during the discussion, she recommended that Dr. Coulibaly "work on his teaching portfolio by developing a specific skill since he [didn't] have pedagogical training." *Id.*  To that end, LTS Fyfe states that she suggested that Dr. Coulibaly develop a "reading lesson plan." *Id.*  In a later meeting, the record indicates that LTS Fyfe suggested that the lesson plan goal was "based on student feedback that he was teaching without a lesson plan." Email from Ann Keller-Lally (Nov. 9, 2011), EEO Investigation Report at 93, ECF No. 36-3.

Throughout the rest of 2011, LTS Fyfe and Dr. Coulibaly continued to experience friction, though LTS Fyfe felt that their issues merely arose because "she [was] telling [Dr. Coulibaly] things that he [didn't] want to hear." *Id.*  LTS Fyfe reports that in advance of a planned observation of Dr. Coulibaly's class the following month, she requested class readings from Dr. Coulibaly.  Email from Laura Fyfe (Nov. 7, 2011), EEO Investigation Report at 721

(noting LTS Fyfe's message to Dr. Coulibaly on August 12, 2011).  According to LTS Fyfe,

Dr. Coulibaly responded by stating that he felt that his students were not yet ready to read.  *See*

*id.* ("He replied that his students were only in week 6, so he was not doing reading with them.").

LTS Fyfe later opined that the reading delay was "out of the ordinary" in the French section,

where she stated that "teachers begin teaching reading starting in the first week with A level texts

varying from advertisements to menus."  *Id.*

According to LTS Fyfe, she observed Dr. Coulibaly's class, as planned, on August 18,

2011.  *Id.*  She followed up with Dr. Coulibaly by email later that day and the next day.  *Id.* at

721–22.[7]  In her August 19, 2011 email, LTS Fyfe told Dr. Coulibaly to "prepare a reading

lesson" for his class based on "the four P's" method.  *See* Email from Laura Fyfe to Tiemoko

Coulibaly (Aug. 19, 2011), EEO Investigation Report at 733, *Coulibaly v. Kerry*, No. 14-0712

(D.D.C. Mar. 4, 2016), ECF No. 26-7.

Five days later, on August 24, 2011, Dr. Coulibaly submitted his reading lesson plan to

LTS Fyfe.[8]  LTS Fyfe later characterized Dr. Coulibaly's lesson plan as "a template for writing a

lesson plan—not an actual lesson plan."  Email from Laura Fyfe (Nov. 7, 2011), EEO

Investigation Report at 722.  LTS Fyfe states that she told Dr. Coulibaly during the following

week that the plan was "a beginning" and then asked Dr. Coulibaly to make improvements—

namely, to include a specific article for reading and to "address some of the specifics of the

---

[7] *See* Email from Laura Fyfe to Tiemoko Coulibaly (Aug. 18, 2011), EEO Investigation Report at 734, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-7; Email from Laura Fyfe to Tiemoko Coulibaly (Aug. 19, 2011), EEO Investigation Report at 733, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-7.

[8] *See* Email from Tiemoko Coulibaly to Laura Fyfe (Aug. 24, 2011), EEO Investigation Report at 732–33, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-7; *see also* Email from Laura Fyfe (Nov. 7, 2011), EEO Investigation Report at 722 (reproducing what LTS Fyfe alleges was the document that Dr. Coulibaly sent her).

article and the timing and level of the lesson." *See id.* at 721–23 (reproducing an email from

August 30, 2011).  According to LTS Fyfe, Dr. Coulibaly responded later that day and requested

clarification about whether his lesson plan was satisfactory.  *See id.* at 723 ("I would be grateful

if you could tell me if this 'beginning' is appropriate or not for you, if it is good or not, so I could

try to improve it.").  LTS Fyfe claims that she responded to Dr. Coulibaly's request by giving

him "specific questions."  *See id.*

      LTS Fyfe states that she again requested a reading lesson plan more than a month later,

on October 3, 2011.  *Id.*  Two days later, Dr. Coulibaly responded by forwarding LTS Fyfe the

lesson plan that he had previously sent her in August.  *See* Email from Tiemoko Coulibaly to

Laura Fyfe (Oct. 5, 2011, 8:55 AM), EEO Investigation Report at 732–33, *Coulibaly v. Kerry*,

No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-7.  LTS Fyfe then clarified that she found the

August lesson plan to be unsatisfactory.  *See* Email from Laura Fyfe to Tiemoko Coulibaly (Oct.

5, 2011), EEO Investigation Report at 732, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4,

2016), ECF No. 26-7 ("[W]hen I wrote, 'this is a beginning,' I was suggesting that [the August

lesson plan was] *not* complete and [that] it needed to be revised." (emphasis in original)).  In

response, Dr. Coulibaly expressed that he was "confused and unclear about what to do exactly"

and stated that he "would appreciate" a time to meet with LTS Fyfe for clarification.  *See* Email

from Tiemoko Coulibaly to Laura Fyfe (Oct. 5, 2011, 12:36 PM), EEO Investigation Report at

731–32, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-7.

      LTS Fyfe states that she attempted to meet with Dr. Coulibaly on October 12, 2011, but

that she "made a mistake about his teaching schedule," so no meeting occurred.  *See* Email from

Laura Fyfe (Nov. 7, 2011), EEO Investigation Report at 724.  LTS Fyfe asserts that, instead, she

delegated the matter to another FSI employee, Dora Chanesman.  *See id.*; Email from Laura Fyfe

to Tiemoko Coulibaly (Nov. 4, 2011), EEO Investigation Report at 731, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-7.

The next month, on November 4, 2011, LTS Fyfe contacted Dr. Coulibaly again about the reading lesson plan and wrote that "[s]ince [she and Dr. Coulibaly had] not been able to set up a time to go over writing a lesson plan, [she had] asked Dora Chanesman [to] assist [him] with the process." Email from Laura Fyfe to Tiemoko Coulibaly (Nov. 4, 2011, 9:57 AM), EEO Investigation Report at 731. Dr. Coulibaly responded later that day with his interpretation of LTS Fyfe's message: "This suggests in my mind that I have refused or I have rejected to 'set up a time to go over writing a lesson plan.'" Email from Tiemoko Coulibaly to Laura Fyfe (Nov. 4, 2011, 7:11 PM), EEO Investigation Report at 728, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-7. Disputing the idea that he was at fault for their inability to meet, Dr. Coulibaly emphasized that he had "never refused to meet with [LTS Fyfe] and [that he had] never refused to do what [she] requested." *Id.*

#### 4. Communications with Second-Line Supervisors

A few days later, on November 7, 2011, Dr. Coulibaly wrote to Acting Division Director Ann Keller-Lally and expressed that he was "feeling hostility" from LTS Fyfe, that he believed he was "a victim of psychological abuse, retaliation and discrimination," and that "this is a case of intentional and negligent infliction of emotional distress to an employee." Email from Tiemoko Coulibaly to Ann Keller-Lally (Nov. 7, 2011), EEO Investigation Report at 727, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-7. In response, Acting Director Keller-Lally provided Dr. Coulibaly with the procedures to report alleged discrimination, but she also suggested a face-to-face meeting with Dr. Coulibaly and with LTS Fyfe to discuss the conflict. Email from Ann Keller-Lally to Tiemoko Coulibaly (Nov. 7,

2011, 5:01 PM), EEO Investigation Report at 725–26, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-7.

That meeting occurred the next day, on November 8, 2011. *See* Email from Ann Keller-Lally (Nov. 9, 2011), EEO Investigation Report at 754–56, ECF No. 36-3 (memorializing the conversation from the meeting in writing). During the meeting, Acting Director Keller-Lally's notes indicate that she met with both LTS Fyfe and Dr. Coulibaly, that Dr. Coulibaly expressed his confusion with respect to LTS Fyfe's instructions, and that LTS Fyfe felt that her instructions were clear. *See id.* at 754–55. In particular, Acting Director Keller-Lally's notes indicate that Dr. Coulibaly found LTS Fyfe's "four P's" method confusing, because another colleague had told Dr. Coulibaly that the method "was not particularly applicable with regard to reading lessons." *Id.* at 754. According to Acting Director Keller-Lally's notes, LTS Fyfe acknowledged "[l]ater in the meeting" that Dr. Coulibaly was "rightly confused." *Id.* Apart from the "four P's" method, Dr. Coulibaly also reportedly expressed that he felt "hostility" from LTS Fyfe, and that "he was sure whatever he proposed would be rejected." *Id.* at 754–55. In response, LTS Fyfe reportedly stated that her goal was to help Dr. Coulibaly to "do the best he could" and felt that she had simply "said some things that [Dr. Coulibaly] did not want to hear." *Id.* at 756. According to Acting Director Kellar-Lally's notes, LTS Fyfe ultimately "offered to drop the reading lesson plan project," and instead requested that Dr. Coulibaly attend formal trainings. *Id.* at 755–56.

The next day, Acting Director Keller-Lally sent her notes documenting the meeting to LTS Fyfe and Dr. Coulibaly. *See generally id.* at 754–56. She told LTS Fyfe and Dr. Coulibaly to "[p]lease feel free to respond with any remarks or corrections based on [their] recollection of what we discussed." *Id.* at 754. The following week, on November 15, 2011, Dr. Coulibaly

provided voluminous comments in response to Acting Director Keller-Lally's notes.  *See* Email

from Tiemoko Coulibaly (Nov. 15, 2011), EEO Investigation Report at 743–49, ECF No. 36-3.

Dr. Coulibaly's response alleged that, during the meeting, LTS Fyfe had accused him of

"'discrimination' 'against' her because of her 'background' and because her 'former husband'

was 'Ivorian' (like [Dr. Coulibaly])."  *Id.* at 744; *see also id.* at 748 (alluding to a point during

the meeting in which LTS Fyfe "became very emotional and . . . started crying," and in which

she mentioned the Ivory Coast "and her former husband, an [Ivorian]").  His response also

accused LTS Fyfe of "knowingly and intentionally act[ing] . . . in bad faith to create false

excuses to . . . punish [Dr. Coulibaly]," of "retaliation," and of "character assassination."  *Id.* at

745–46.  Reacting to Dr. Coulibaly's comments, LTS Fyfe asserted that there was "no basis for

his [accusations]," though she admitted that she "was brought to tears" and "did ask

[Dr. Coulibaly] if he had an ax to grind against [her] because of [her] ex."  Email from Laura

Fyfe to Debra Blake (Nov. 15, 2011), EEO Investigation Report at 743, ECF No. 36-3.

 The record indicates that, meanwhile, on November 9, 2011, Dr. Coulibaly had requested

a change in supervisor.  *See* Blake Aff. ¶ Q15, Defs.' Facts Ex. D, ECF No. 30-4 ("On 11/9/11

[Dr. Coulibaly] first made a request for a new [s]upervisor.").  FSI management appears to have

decided to delay any change of supervisor because only two months remained in the reporting

period; and, a change would have left any new supervisor without adequate observation time

before year-end performance ratings.  *See id.*; Keller-Lally Aff. ¶ Q15, Defs.' Facts Ex. KK, ECF

No. 30-37.

 On November 16, 2011, the day after Dr. Coulibaly and LTS Fyfe responded to Acting

Director Keller-Lally's notes, Division Director Debra Blake, having returned to the office, met

with Dr. Coulibaly to address his accusations.  *See* Blake Mem. (Nov. 15, 2011), EEO

Investigation Report at 773–74, ECF No. 36-4.[9]  In her notes documenting this conversation, Director Blake claimed that her purpose in calling the meeting was to determine "precisely what actions" Dr. Coulibaly felt were evidence of LTS Fyfe's "discrimination and hostility."  *Id.* at 773.  According to Director Blake, Dr. Coulibaly was initially "reluctant" to articulate specific allegations of discrimination and hostility, but he then cited the fact that LTS Fyfe's "former husband shared the same country of origin" as Dr. Coulibaly, as well as allegations that LTS Fyfe treated Dr. Coulibaly unfairly in the way that she supervised him.  *See id.*  Director Blake shared her notes of the meeting with Dr. Coulibaly the next week.  *See* Email from Debra Blake to Tiemoko Coulibaly (Nov. 22, 2011), EEO Investigation Report at 764–65, ECF No. 36-3.

The day after Dr. Coulibaly received Director Blake's notes, Dr. Coulibaly responded with lengthy comments that expressed his views on the conversation.  *See* Email from Tiemoko Coulibaly (Nov. 23, 2011), EEO Investigation Report at 764, ECF No. 36-3; Coulibaly Mem. (Nov. 23, 2011), EEO Investigation Report at 766–72, ECF No. 36-4.  In his comments, Dr. Coulibaly repeatedly expressed that he believed that Director Blake was "simply trying to protect" LTS Fyfe: he wrote that Director Blake "had already decided to totally support" LTS Fyfe and had become "a zealous lawyer" for LTS Fyfe during the meeting.  *See* Coulibaly Mem. (Nov. 23, 2011), EEO Investigation Report at 766–72.

---

[9] Director Blake actually dated her memorandum November 15, 2011, *see* Blake Mem. (Nov. 15, 2011), EEO Investigation Report at 773–74, but, as Dr. Coulibaly noted in his response to Director Blake's memorandum, the meeting in fact took place on November 16, 2011, *see* Coulibaly Mem. (Nov. 23, 2011), EEO Investigation Report at 766, ECF No. 36-4. *See also* Email from Debra Blake to Laura Fyfe (Nov. 16, 2011), EEO Investigation Report at 757, ECF No. 36-3 (stating that Director Blake intended to meet with Dr. Coulibaly that day).

That same day, Director Blake met with both Dr. Coulibaly and LTS Fyfe to facilitate their working relationship going forwarded.  *See* Email from Laura Fyfe (Nov. 23, 2011, 3:12 PM), EEO Investigation Report at 761–62, ECF No. 36-3 (memorializing the meeting).  At the meeting, LTS Fyfe reports that she told Dr. Coulibaly that "the administration ha[d] ruled" that she would continue as Dr. Coulibaly's supervisor, even though he had requested a change in supervisor.  *Id.* at 762.  LTS Fyfe states that she also expressed "her willingness to move forward in the supervisory role" and that she and Dr. Coulibaly "both agreed to work productively with each other."  *Id.*  Dr. Coulibaly later emailed LTS Fyfe to clarify the procedure for changing supervisors.  *See* Email from Tiemoko Coulibaly (Nov. 23, 2011, 4:35 PM), EEO Investigation Report at 761, ECF No. 36-4.  LTS Fyfe responded by informing Dr. Coulibaly that "[t]he decision was made to keep [her] as [his] supervisor until at least the end of this year (December 31, 2011)" and that she had "not received approval to change [his] supervisor . . . after that point."  Email from Laura Fyfe (Nov. 23, 2011, 5:33 PM), EEO Investigation Report at 761, ECF No. 36-3.

A few weeks later, on December 14, 2011, Director Blake and LTS Fyfe met again with Dr. Coulibaly to address a new point of contention: his alleged failure to submit required weekly syllabi for a period of three weeks.[10]  According to Director Blake, Dr. Coulibaly acknowledged that he had not submitted the weekly syllabi, but claimed that he had been too busy.  Blake Mem. (Dec. 14, 2011), EEO Investigation Report at 787, ECF No. 36-4.  Director Blake further reports that Dr. Coulibaly continued to allege that "he felt discriminated against and felt he was being treated unfairly," particularly when compared to "one other instructor who entered on duty on

---

[10] *See* Email from Debra Blake (Dec. 15, 2011), EEO Investigation Report at 786, ECF No. 36-4 (noting the meeting that took place the day before); Blake Mem. (Dec. 14, 2011), EEO Investigation Report at 787, ECF No. 36-4.

the same date." *Id.* Dr. Coulibaly commented the next day that, at their meeting, he had "clearly insisted on the issue of discrimination" and that he had noted "the different standards between teacher Hmimiche AitMouloud ('Mimiche')" and himself. Email from Tiemoko Coulibaly (Dec. 15, 2011), EEO Investigation Report at 785–86, ECF No. 36-4. Dr. Coulibaly also states that he had questioned whether Mr. Hmimiche had been held to the syllabus requirement. *Id.*

### 5.  EEO Complaint

Around the time that he was communicating with Director Blake, Dr. Coulibaly made contact with the Department of State's Office of Civil Rights and filed an informal Equal Employment Opportunity ("EEO") complaint.[11] Dr. Coulibaly filed a formal EEO complaint on December 20, 2011. *See* Compl. ¶ 95; Formal Compl. of Discrimination, EEO Investigation Report at 62–63, ECF No. 36-3. The complaint alleged that FSI management had discriminated against Dr. Coulibaly on the basis of race, color, and national origin and had committed "reprisal" against him. *See* Formal Compl. of Discrimination, EEO Investigation Report at 62–64, ECF No. 36-3. The complaint brought up issues relating both to Dr. Coulibaly's recent conflicts with his supervisors and to Dr. Coulibaly's allegations relating to events in 2009. *See id.* at 64; *see also supra* Part II.A.4–5 (discussing events Dr. Coulibaly alleges occurred in 2009). The Office of Civil Rights filed Dr. Coulibaly's complaint under EEO Case Number DOS-F-025-12. *See* Letter from Jacqueline Canton to Tiemoko Coulibaly, EEO Investigation Report at 58, ECF No. 36-3.

---

[11] *See* Compl. ¶ 95 (stating that Dr. Coulibaly filed an informal EEO complaint on November 23, 2011); EEO Counselor's Report, EEO Investigation Report at 68–73, ECF No. 36-3 (showing that Dr. Coulibaly made contact with an EEO Counselor at the Department of State on November 18, 2011); Email from Debra Blake (Nov. 28, 2011), EEO Investigation Report at 776, ECF No. 36-4 (discussing "the EEO complaint filed by Tiemoko Coulibaly last week").

6. Performance Appraisal Report

Later in December 2011, Dr. Coulibaly received a Performance Appraisal Report ("PAR") from LTS Fyfe that noted "several issues" with Dr. Coulibaly's performance.[12] LTS Fyfe noted that Dr. Coulibaly was "continu[ing] to attempt to repair" his performance with respect to those issues.  PAR Report by Laura Fyfe, EEO Investigation Report at 790, ECF No. 36-4.

In response, Dr. Coulibaly sent an email to Director Blake, LTS Fyfe, and others in FSI management, in which he alleged that the PAR was "evidence of retaliation" and that Director Blake and LTS Fyfe could not "separate performance evaluation from discrimination and retaliation against" Dr. Coulibaly.  Email from Tiemoko Coulibaly (Dec. 27, 2011), EEO Investigation Report at 788–89, ECF No. 36-4.  Dr. Coulibaly's email accused his supervisors of omitting "the important issues of discrimination and retaliation" in the PAR, given that, according to Dr. Coulibaly, "these disputes clearly influenced [their] performance report."  *Id.* at 789.

Director Blake responded by telling Dr. Coulibaly that he should pursue his discrimination allegations "through the proper channels" and that LTS Fyfe, as his supervisor, "reported on [his] performance as required."  Email from Debra Blake to Tiemoko Coulibaly (Dec. 28, 2011), EEO Investigation Report at 795–96, ECF No. 36-4.  She also stated that Dr. Coulibaly had "been repeatedly instructed to refrain from this line of accusations" while discussing his work performance.  *Id.*  She opined that, therefore, his continued accusations were "tantamount to insubordination."  *Id.*  Continuing his disagreement with Director Blake,

---

[12] *See* Email from Tiemoko Coulibaly (Dec. 27, 2011), EEO Investigation Report at 788–89, ECF No. 36-4; *see also* PAR Report by Laura Fyfe, EEO Investigation Report at 790, ECF No. 36-4 (discussing Dr. Coulibaly's lesson plans and weekly syllabi).

Dr. Coulibaly responded by stating that "[t]here is no insubordination when a teacher denounces discrimination and retaliation," and he reiterated that the PAR "was simply discrimination and retaliation."  Email from Tiemoko Coulibaly to Debra Blake (Dec. 28, 2011, 4:09 PM), EEO Investigation Report at 795, ECF No. 36-4.  In this vein, Dr. Coulibaly alleged that Director Blake and LTS Fyfe viewed Dr. Coulibaly as "their target" and did not require other teachers—such as Mr. Hmimiche—to submit syllabi in order to fulfill job responsibilities.  Email from Timoko Coulibaly to Debra Blake (Dec. 28, 2011, 3:55 PM), EEO Investigation Report at 96–97, ECF No. 36-3 (emphasis omitted).

7.  Event for FSI's French Language and Culture Instructors

The next day, on December 29, 2011, Dr. Coulibaly attended an event for FSI's French Language and Culture instructors.  *See* Casteuble Mem. (Jan. 24, 2012), EEO Investigation Report at 815, ECF No. 36-4; *see also* Cazeau Aff., EEO Investigation Report at 1339–40, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-12.  Evidence in the record shows different views regarding the purpose of the meeting and the nature of Dr. Coulibaly's actions during the meeting.

Defendants adopt the position taken in a memorandum written by LTS Phillipe Casteuble, who stated that the meeting was a "training workshop provided to all French Language and Culture Instructors" about "specifications for writing the weekly syllabi." Casteuble Mem. (Jan. 24, 2012), EEO Investigation Report at 815; *see also* Defs.' Facts ¶¶ 17–21 (adopting LTS Casteuble's view).  LTS Casteuble's memorandum also accuses Dr. Coulibaly of "inappropriate conduct" and comments that "were off topic" during the meeting: Dr. Coulibaly allegedly "stood up and loudly began to speak about the 'No Fear Act' and discrimination and retaliation against [him] on the part of the French Supervisors," and he

allegedly "continued to stand up and loudly protest" despite LTS Casteuble's request for

Dr. Coulibaly to sit down.  Casteuble Mem. (Jan. 24, 2012), EEO Investigation Report at 815.

But Dr. Coulibaly's colleague, Elder Cazeau, took a different view of the meeting.

Mr. Cazeau recalls that the meeting was merely a "section meeting that had been organized to

discuss lesson plans."  Cazeau Aff., EEO Investigation Report at 1339.  Mr. Cazeau also

recounts that Dr. Coulibaly "was publicly humiliated and silenced by his supervisor who told

him that he could not use the meeting as a platform to air his personal issues."  *Id.* at 1339–40.

In particular, Mr. Cazeau states that "Dr. Coulibaly started saying that he felt discriminated

against because of his lesson plan," that Dr. Coulibaly's supervisor "cut him off," and that

"Dr. Coulibaly remained silent" after that.  *Id.* at 1440.

### 8.  Conflict with New Supervisor Philippe Casteuble

In January 2012, LTS Casteuble replaced LTS Fyfe as Dr. Coulibaly's supervisor.  *See*

Email from Tiemoko Coulibaly (Jan. 27, 2012), EEO Investigation Report at 813–14, ECF

No. 36-4 (indicating that LTS Casteuble's first day as Dr. Coulibaly's new supervisor was on

January 24, 2012); Casteuble Aff. ¶ Q3, Defs.' Facts Ex. J, ECF No. 30-10 (indicating that

Dr. Coulibaly started reporting to LTS Casteuble in January 2012).  On January 24, 2012,

LTS Casteuble met with Dr. Coulibaly with the expressed intention of "talk[ing] about

expectations."  *See* Email from Philippe Casteuble to Tiemoko Coulibaly (Jan. 23, 2012), EEO

Investigation Report at 814, ECF No. 36-4.[13]  But, during the meeting, LTS Casteuble presented

Dr. Coulibaly with a memorandum that outlined an "informal counseling session" regarding

Dr. Coulibaly's conduct at the December 29, 2011 meeting and that reprimanded him for his

---

[13] *See* Email from Tiemoko Coulibaly (Jan. 27, 2012), EEO Investigation Report at
813–14 (indicating that their meeting occurred on January 24, 2012).

conduct at that meeting.[14]  LTS Casteuble's memorandum surprised Dr. Coulibaly, who had

believed that the January 24 meeting "was only about expectations on teaching."  Email from

Tiemoko Coulibaly (Jan. 27, 2012), EEO Investigation Report at 813–14.  Dr. Coulibaly was

further surprised by the fact that a human resources representative was present for the meeting.[15]

That same day, LTS Casteuble emailed Dr. Coulibaly and thanked him for submitting his

weekly syllabus.  *See* Email from Philippe Casteuble to Tiemoko Coulibaly (Jan. 24, 2012), EEO

Investigation Report at 829–30, ECF No. 36-4.  In his email, LTS Casteuble also asked

Dr. Coulibaly a list of questions regarding the syllabus.  *See id.* (asking, among other things,

whether "there is a theme" that Dr. Coulibaly planned to explore, and how an activity would help

Dr. Coulibaly's students "reach the professional proficiency level").

Some time later, LTS Casteuble again brought up the issue of Dr. Coulibaly's weekly

syllabus.  On February 2, 2012, LTS Casteuble emailed Dr. Coulibaly and said that, after looking

at Dr. Coulibaly's weekly syllabus, he needed "to talk about it" with Dr. Coulibaly.  Email from

Philippe Casteuble to Tiemoko Coulibaly (Feb. 2, 2012), EEO Investigation Report at 820, ECF

No. 36-4.  LTS Casteuble suggested a meeting early the next morning.  *See id.*  Because

Dr. Coulibaly "was very surprised by what happened in [LTS Casteuble's] office at the meeting

of January 24, 2012," Dr. Coulibaly asked to schedule the proposed meeting to later in the day so

that he could arrange for a union representative to be present.  Email from Tiemoko Coulibaly

---

[14] *See* Email from Tiemoko Coulibaly (Jan. 27, 2012), EEO Investigation Report at 813 ("I was surprised when Philippe gave me his letter . . . reprimanding me for an incident of December 29, 2011."); *see also* Casteuble Mem. (Jan. 24, 2012), EEO Investigation Report at 815, ECF No. 36-4 (reproducing LTS Casteuble's memorandum).

[15] *See* Email from Tiemoko Coulibaly (Jan. 27, 2012), EEO Investigation Report at 813 (indicating Dr. Coulibaly's surprise at Phuong Nguyen's presence); *see also* Email from Phuong Nguyen to James North (Feb. 3, 2012), EEO Investigation Report at 821, ECF No. 36-4 (indicating that Phuong Nyugen was a "Supervisory HR Specialist" at FSI).

(Feb. 2, 2012), EEO Investigation Report at 819, ECF No. 36-4.  After confirming with his own superiors that it was appropriate for a union representative to attend the meeting, LTS Casteuble proposed a meeting on February 6, 2012 and informed Dr. Coulibaly that a union representative could attend.[16]  But the February 6, 2012 meeting ultimately did not occur: even though Dr. Coulibaly emailed LTS Casteuble to confirm the meeting time on February 6, LTS Casteuble claimed that, based on prior communications, he "could not know if the date and time was accepted, by [Dr. Coulibaly] and by the union representative."[17]

That same day, LTS Casteuble also wrote Dr. Coulibaly a separate email that reminded Dr. Coulibaly about LTS Casteuble's January 24, 2012 questions about Dr. Coulibaly's weekly syllabus.  *See* Email from Philippe Casteuble to Tiemoko Coulibaly (Feb. 6, 2012, 8:29 AM), EEO Investigation Report at 829, ECF No. 36-4 ("This is a friendly reminder that as of today I have not received any response on the 14 questions I asked . . . .").  In response, Dr. Coulibaly asserted that he had responded to LTS Casteuble's questions by requesting a meeting with him, and that LTS Casteuble "never responded" to Dr. Coulibaly's request.  *See* Email from Tiemoko Coulibaly (Feb. 6, 2012, 9:19 AM), EEO Investigation Report at 827–28, ECF No. 36-4 ("[A] meeting would be more appropriate to answer your '14 questions.'").  Dr. Coulibaly also sent a separate email to LTS Casteuble, in which he noted that all of his students had passed their

---

[16] *See* Email from Philippe Casteuble to Tiemoko Coulibaly (Feb. 3, 2012, 12:13 PM), EEO Investigation Report at 833, ECF No. 36-4; Email from Phillip Casteuble to Tiemoko Coulibaly (Feb. 3, 2012, 1:26 PM), EEO Investigation Report at 832, ECF No. 36-4.

[17] *See* Email from Tiemoko Coulibaly to Philippe Casteuble (Feb. 6, 2012, 8:32 AM), EEO Investigation Report at 832, ECF No. 36-4 (writing to confirm the 9:00 AM meeting on February 6, 2012); Email from Philippe Casteuble to Tiemoko Coulibaly (Feb. 6, 2012, 8:51 AM), EEO Investigation Report at 831, ECF No. 36-4 (opining that LTS Casteuble did not know whether the 9:00 AM time was acceptable); Email from Tiemoko Coulibaly to Philippe Casteuble (Feb. 6, 2012, 9:08 AM), EEO Investigation Report at 831, ECF No. 36-4 (indicating that the 9:00 AM meeting did not occur).

recent tests, forwarded complimentary remarks from one of his students, and opined that "[n]othing [was] wrong with [his] syllabus." *See* Email from Tiemoko Coulibaly (Feb. 6, 2012, 9:34 AM), EEO Investigation Report at 839–41, ECF No. 36-4.  In light of his students' success, Dr. Coulibaly characterized the criticisms of his syllabi as harassment. *See id.* ("Instead of congratulating me, you are constantly harassing me with [the] Syllabus issue as Debra and Laura Fyfe did [for] the last 6 months.").

But despite Dr. Coulibaly's communications with LTS Casteuble, Dr. Coulibaly received another counseling memorandum on February 10, 2012, which again criticized Dr. Coulibaly's syllabi. *See* Casteuble Mem. (Feb. 10, 2012), Defs.' Facts Ex. P, ECF No. 30-16 (reproducing the memorandum).  Perhaps because of the counseling memorandum, Dr. Coulibaly provided his answers to LTS Casteuble's January 24, 2012 questions that day.  *See* Email from Tiemoko Coulibaly (Feb. 10, 2012), EEO Investigation Report at 902–04, ECF No. 36-4.  Dr. Coulibaly also requested a sample satisfactory syllabus.  *See id.* at 904 ("I would appreciate if you could provide an example of a perfect syllabus you like so I can follow it line by line.").  Although LTS Casteuble expressed privately to Director Blake and LTS Fyfe that he found Dr. Coulibaly's answers unsatisfactory, he later provided Dr. Coulibaly with additional feedback and a sample syllabus to reference.[18]

### 9.  Absence from Work

Dr. Coulibaly alleges that the discrimination at work caused him to become ill and that, at the direction of his doctor, he took leave.  *See* Compl. ¶ 175; Letter from Willie Hamlin to

---

[18] *See* Email from Philippe Casteuble (Feb. 13, 2012, 8:13 AM), EEO Investigation Report at 895, ECF No. 36-4 ("I see a laundry list of activities but I still don't see how they reinforce each other or how they are linked with his teaching objectives."); Email from Philippe Casteuble to Tiemoko Coulibaly (Feb. 13, 2012, 2:57 PM), EEO Investigation Report at 901, ECF No. 36-4 (providing Dr. Coulibaly with feedback and a sample syllabus).

Catherine Russell at 2, Pl.'s Resp. Ex., at 146, ECF No. 36-2 ("It is recommended that

[Dr.] Coulibaly <u>not</u> return to work prior to March 26, 2012.").[19]  FSI human resources documents

reflect that, beginning on Monday February 15, 2012 and until Friday March 23, 2012,

Dr. Coulibaly took a combination of sick leave, annual leave, and leave without pay for six

weeks.  *See* Defs.' Facts. Ex. Q, at 1315, 1317, ECF No. 30-17.

### 10.  Termination

On April 2, 2012, FSI terminated Dr. Coulibaly's employment, effective April 6, 2012,

because of his "inappropriate interactions with [his] supervisors, and [his] failure to follow

established procedures for requesting leave."  Letter from Catherine Russell to Tiemoko

Coulibaly (Apr. 2, 2012), Pl.'s Resp. Ex. 6, at 25, ECF No. 36-2.

### C.  Subsequent Procedural History

After Dr. Coulibaly's termination, the Department of State's Office of Civil Rights

continued to process Dr. Coulibaly's discrimination allegations filed under EEO Case Number

DOS-F-025-12.  *See* Defs.' Facts Ex. II, ECF No. 30-35 (reproducing letters from the Office to

Dr. Coulibaly about his claims).  The Office of Civil Rights allowed Dr. Coulibaly to amend his

claims to include allegations of wrongdoing relating to his leave requests and to his termination.

*See id.* at 8–13. But the Office of Civil Rights dismissed Dr. Coulibaly's discrimination

allegations relating to 2009 events as untimely filed.  *See id.* at 6–7.

Dr. Coulibaly also brought other claims before the Department of State and other

agencies—mostly claims that sought to bring to light additional wrongdoing that Dr. Coulibaly

felt occurred in the handling of his discrimination allegations.  Thus, for instance, on August 20,

---

[19] Because the initial exhibits appended to Dr. Coulibaly's opposition brief are not consecutively paginated, the Court also includes the page number automatically generated by ECF.

2013—after Dr. Coulibaly's case had apparently escalated to the Merit Systems Protection Board ("MSPB")—the Department of State's Office of Civil Rights dismissed Dr. Coulibaly's separate discrimination claim filed under EEO Case Number DOS-F-119-13.  *See* Defs.' Facts Ex. V, ECF No. 30-22 (reproducing the Office's dismissal letter).  That claim had alleged discrimination based on the fact that the Department had provided the MSPB with the position description for Dr. Coulibaly that was dated June 15, 2007.  *See id.* at 1; *see also supra* Part II.A.3 (discussing that 2007 position description, and the competing views about its origin and purpose).  The Department held that Dr. Coulibaly should have filed this claim with the MSPB itself, and accordingly dismissed it.  *See* Defs.' Facts Ex. V at 1.

In 2014, Dr. Coulibaly brought additional discrimination allegations against the Department of State, which the Department's Office of Civil Rights filed under EEO Case Number DOS-0207-14.  *See* Defs.' Facts Ex. W ¶¶ 24, 39, ECF No. 30-23 (discussing Dr. Coulibaly's allegations in the EEO Counselor's Report); Defs.' Facts Ex. X, ECF No. 30-24 (discussing the allegations in a letter filed under EEO Case Number DOS-0207-14).  This time, Dr. Coulibaly claimed that the Department conspired with the MSPB to dismiss whistleblower claims that he had brought before the MSPB.  *See* Defs.' Facts Ex. W, ¶ 39.  The Office of Civil Rights dismissed this claim on June 24, 2014, and held that Dr. Coulibaly should have also lodged this claim with the MSPB itself, instead of the Department.  *See* Defs.' Facts Ex. X (reproducing the dismissal letter).

Lastly, on October 13, 2015, the Department of State dismissed yet another set of Dr. Coulibaly's discrimination claims, filed under EEO Case Number DOS-0232-15.  *See* Pl.'s

Resp. Ex., at 56–60, ECF No. 36-2 (reproducing the dismissal letter).[20]  In those claims,

Dr. Coulibaly had alleged that the Department had failed to provide him with a reasonable

accommodation for his supervisor and had improperly handled the processing of his medical

documentation.  *See id.* at 56, ECF No. 36-2.  The Department dismissed the claim because it

held that he had not timely brought his claim to an EEO counselor and because his claim failed

to "allege present harm to a term, condition, or privilege of employment inflicted on the basis of

[a protected class]."  *Id.* at 56–58, ECF No. 36-2.

Apart from discrimination allegations raised before the Department of State,

Dr. Coulibaly also began filing claims under the Federal Tort Claims Act ("FTCA") in 2014.  In

that year, Dr. Coulibaly filed five FTCA claims against the Department of State, seeking

damages in the amounts of $10,000,000; $50,000,000; $50,000,000; $55,000,000; and

$60,000,000.  *See* Defs.' Facts Ex. C, at 5–8, ECF No. 30-25;[21] *id.* Ex. CC, ECF No. 30-29.  He

filed three FTCA claims against members of the MSPB, seeking damages in the amounts of

$5,000,000; $55,000,000; and $60,000,000.  *See id.* Ex. C, at 2–3; *id.* Ex. EE, ECF No. 30-31.

And Dr. Coulibaly filed two FTCA claims against the EEOC, seeking damages in the amounts of

$25,000,000 and $50,000,000.  *Id.* Ex. C, at 4; *id.* Ex. DD, ECF No. 30-30.

As further background for the case before the Court now, Dr. Coulibaly notes that in

March 2013, the Office of the Inspector General at the Department of State (OIG) conducted an

investigation of the French section within FSI.  Compl. ¶ 82.  The OIG determined that FSI had

"a significant number of Equal Employment Opportunity . . . and harassment-related

---

[20] Because the initial exhibits appended to Dr. Coulibaly's opposition brief are not consecutively paginated, the Court also includes the page number automatically generated by ECF.

[21] Because the various FTCA claims compiled in Defendants' Exhibit C are not consecutively paginated, the Court cites to the ECF numbers automatically generated by ECF.

complaints." Defs.' Reply Pl.'s Opp'n Defs.' Mot. Dismiss or Summ. J. ("Defs.' Reply") Att. F, at 7, ECF No. 42-6 (reproducing the relevant excerpt of the report). *See generally* Office of Inspector Gen., U.S. Dep't of State & Broad. Bd. of Governors, *Inspection of the Foreign Service Institute* (Mar. 2013), https://oig.state.gov/system/files/209366.pdf (reproducing the entire report, but with some portions redacted).[22]

Dr. Coulibaly claims that he first filed the present litigation on November 15, 2013. Compl. ¶ 162; *see also* ECF No. 1 (showing that Dr. Coulibaly's initial complaint was stamped "Received" in November 2013, but that the stamp was later crossed out). But that the complaint was not docketed until February 10, 2014. *See* ECF No. 1 (showing that the initial complaint was stamped "Filed" on February 10, 2014). In a pre-answer motion, Defendants move to dismiss the complaint or, in the alternative, for summary judgment. *See* Defs.' Mot. Dismiss or, in the Alt., for Summ. J., ECF No. 30. Combined with his opposition brief, Dr. Coulibaly has filed a motion for leave to file a fourth amended complaint. *See* Pl.'s Resp., ECF No. 36. Dr. Coulibaly also later filed a motion to add newly acquired evidence to the record. *See* Pl.'s Mot. Add Newly Acquired Evid., ECF No. 39.

## III. ANALYSIS

Before the Court addresses the merits of the parties' respective motions, the Court addresses Defendants' suggestion that the Court strike Dr. Coulibaly's opposition brief.

---

[22] Dr. Coulibaly requests that this Court require the Department of State to submit the full report on the record. Compl. ¶ 90. Given that almost all of the report is available in the public record and given Dr. Coulibaly's inability to draw any causal link between the report and his purported claims, the Court sees no reason to force such a disclosure at this time. This issue can be revisited during discovery on Dr. Coulibaly's discrimination and retaliation claims.

### A. Length of Dr. Coulibaly's Opposition Brief

In their reply brief, Defendants suggest that the Court strike Dr. Coulibaly's opposition brief and claim that the extreme length of his submission violates Local Civil Rule 7(e). *See* Defs.' Reply at 1, ECF No. 42. Defendants cite *OAO Alfa Bank v. Center for Public Integrity,* 387 F. Supp. 2d 20, 39 (D.D.C. 2005), as support for striking the excessive pages. But Defendants do not mention that the *OAO* court granted the noncompliant party leave to amend and, later, reconsidered the amended motion. *Id.* Further, the parties in *OAO* were represented by counsel and, therefore, did not receive the expanded deference afforded to a *pro se* plaintiff such as Dr. Coulibaly. *See id.* at 22–23, 39. Thus, *OAO* at most stands for the proposition that the Court should offer Dr. Coulibaly an opportunity to revise and resubmit his opposition brief.

Defendants also cite *Corson & Gruman Co. v. NLRB*, 899 F.2d 47, 50–51 n.4 (D.C. Cir. 1990), as analogous support. However, that case is also distinguishable because it did not involve a *pro se* plaintiff. *See id.* at 48. Consequently, because Dr. Coulibaly is *pro se*, the Court will decline to strike Dr. Coulibaly's opposition brief but will warn Dr. Coulibaly to comply with this Court's rule on briefing length limits in the future. If he does not, the Court will exercise its authority to strike any future briefs that go over the applicable limits.

### B. Tort and Contract Claims

The Court now turns to the merits of Defendants' motion to dismiss or, in the alternative, for summary judgment. The Court addresses Defendants' arguments in a few groups, roughly divided based on the laws under which Dr. Coulibaly's claims might reasonably fall. The Court first addresses Dr. Coulibaly's tort and contract claims, before turning to his claims under Title VII of the Civil Rights Act of 1964, the Rehabilitation Act, the First Amendment of the Constitution, and District of Columbia local statutes.

The following counts of the complaint appear to allege tort or contract claims:

(1) Count 7, which alleges intentional and negligent infliction of emotional distress, *see* Compl. ¶¶ 108–09;

(2) Count 8, which alleges active concealment of Dr. Coulibaly's 2007 hiring and contends that the concealment is evidence of misrepresentation and fraud, *see id.* ¶¶ 110–11;

(3) Count 9, for promissory fraud, *id.* ¶¶ 112–13;

(4) Count 10, which appears to allege a breach of an implied covenant of good faith and fair dealing, *see id.* ¶¶ 114–15;

(5) Count 11, which alleges promissory estoppel, *id.* ¶¶ 116–17;

(6) Count 16, which broadly alleges that Dr. Coulibaly timely exhausted his FTCA claims for infliction of emotional distress, *see id.* ¶¶ 143–64;

(7) The first of the two counts labeled "Count 19" in Dr. Coulibaly's complaint, which alleges defamation and character assassination, *id.* ¶¶ 184–92; and

(8) Count 21, which alleges conspiracy to commit fraud, extortion, infliction of emotional distress, and personal injury under the FTCA, *see id.* ¶¶ 207–08.

Before turning to the merits of these claims, however, the Court reviews the legal standard for Defendants' motion to dismiss them.

### 1. Legal Standards

Defendants' arguments about the tort and contract counts rest on jurisdictional grounds, on Dr. Coulibaly's failure to state a claim, and on insufficient service of process. The Court accordingly applies the legal standards for motions to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), for insufficient service of process

under Federal Rule of Civil Procedure 12(b)(5), and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[23]

### a. Rule 12(b)(1)

Federal courts are courts of limited jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction." *Rasul v. Bush*, 542 U.S. 466, 489 (2004) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).  It is the plaintiff's burden to establish that the court has subject matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  To determine whether jurisdiction exists, a court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003).

The United States "is immune from suit save as it consents to be sued, and the terms of consent to be sued in any court define that court's jurisdiction to entertain the suit." *Fornaro v. James*, 416 F.3d 63, 66 (D.C. Cir. 2005) (internal quotation marks omitted) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)).  "If sovereign immunity has not been waived, a claim is subject to dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction." *Clayton v. Dist. of Columbia*, 931 F. Supp. 2d 192, 200 (D.D.C. 2013) (citing *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature.")).  Courts "may not find a waiver unless Congress' intent is 'unequivocally expressed' in the relevant statute." *Hubbard v.*

---

[23] Defendants' motion also appears to seek dismissal under Federal Rule of Civil Procedure 8(a).  *See* Mem. Supp. Defs.' Mot. Dismiss or, in the Alt., for Summ. J. ("Defs.' Mem.") 1–2, ECF No. 30.  A complaint is subject to dismissal under Rule 8(a) when there is insufficient notice to allow the defense of the plaintiff's claims. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002).  Because Defendants do not develop this line of reasoning in their motion brief, *see* Defs.' Mem., the Court will not consider it.

*Adm'r, EPA*, 982 F.2d 531, 532 (D.C. Cir. 1992) (quoting *United States v. Mitchell*, 445 U.S. 535, 538 (1980)).

Because sovereign immunity is a jurisdictional issue, *FDIC v. Meyer*, 510 U.S. 471, 475 (1994), Defendants' arguments invoking sovereign immunity require the Rule 12(b)(1) standard of review, not the Rule 12(b)(6) standard of review, to govern the Court's analysis. Therefore, Dr. Coulibaly has the burden to prove that Congress has waived sovereign immunity for the claims Plaintiff brings against the United States, the Department of State and any federal employees, if sued in their official capacity. *See Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003).

### b. Rule 12(b)(5)

"Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987); *accord Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 514 (D.C. Cir. 2002). When the propriety of service is challenged, "[b]y the plain text of Rule 4, the plaintiff has the burden to 'demonstrate that the procedure employed to deliver the papers satisfies the requirement of the relevant portions of Rule 4.'" *Mann v. Castiel*, 681 F.3d 368, 372 (D.C. Cir. 2012) (quoting 4A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1083 (3d ed. 2002 & Supp. 2012)).

In cases in which the plaintiff proceeds *in forma pauperis*, the Court must "order that service be made by a United States marshal or deputy marshal or by a person specially appointed by the court." Fed. R. Civ. P. 4(c)(3). Further, parties proceeding *pro se* "are allowed more latitude than litigants represented by counsel to correct defects in service of process and pleadings." *Moore v. Agency for Int'l Dev.*, 994 F.2d 874, 876 (D.C. Cir. 1993). This latitude,

however, "does not constitute a license for a plaintiff filing pro se to ignore the Federal Rules of Civil Procedure." *Id.* (internal quotation marks omitted) (quoting *Jarrell v. Tisch*, 656 F. Supp. 237, 239 (D.D.C. 1987)).

### c. Rule 12(b)(6)

In considering a motion to dismiss under Rule 12(b)(6), the Court presumes that the complaint's factual allegations are true and construes them liberally in the plaintiff's favor. *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000). A Rule 12(b)(6) motion does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Brewer v. Dist. of Columbia*, 891 F. Supp. 2d 126, 130 (D.D.C. 2012).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555–56 (citations and footnote omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of the legal conclusions that are couched as factual allegations, *see Twombly*, 550 U.S. at 555.

## 2. Official Capacity Claims

Defendants in this action are the United States, Secretary Kerry in his official capacity, and all other defendants in their official and personal capacities. *See* Compl. ¶¶ 19–23. The Court first addresses Dr. Coulibaly's tort and contract claims against the United States and against the individual defendants in their official capacities, before turning to Dr. Coulibaly's claims against individual defendants in their personal capacities.

With respect to the tort and contract claims against the United States and against the individual defendants in their official capacities, Dr. Coulibaly must establish that a waiver of sovereign immunity applies. The federal government, its agencies, and federal officials when sued in their official capacities are shielded from actions for damages unless sovereign immunity has been waived. *See Friends of the Earth v. EPA*, 934 F. Supp. 2d 40, 45–46 (D.D.C. 2013) (citing *FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985)).

For tort claims, the relevant waiver of sovereign immunity is the FTCA. *See generally* ch. 753, Title IV, 60 Stat. 842 (1946) (codified as amended at 28 U.S.C. §§ 2671–2680). Under the FTCA, the United States is liable "for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission" of any federal employee acting with the scope of his employment. 28 U.S.C. § 1346(b)(1); *see id.* § 2674 (declaring that "[t]he United States shall be liable" for tort claims as described in § 1346).

But the FTCA does not typically apply to claims arising out of "interference with contract rights." *Id.* § 2680(h). For contract claims, the relevant waiver of sovereign immunity is the Tucker Act. *See* ch. 359, 24 Stat. 505 (1887) (codified as amended at 28 U.S.C. § 1491). Under the Tucker Act, Congress waived sovereign immunity with respect to "any claim against the

United States . . . upon any express or implied contract with the United States."  28 U.S.C. § 1491(a)(1).

In analyzing Dr. Coulibaly's tort claims against the United States and its employees in their official capacities, the Court uses the FTCA as the relevant framework.  In doing so, the Court addresses Counts 7, 8, 9, 10, 11, 16, and 21 of Dr. Coulibaly's complaint, as well as the first of the two counts labeled "Count 19."  The Court then discusses Dr. Coulibaly's contract claims against the United States and its employees in their official capacities, using the Tucker Act as the relevant framework.  In doing so, the Court addresses Counts 8, 9, 10, 11, and 21 of Dr. Coulibaly's complaint.

### a.  Tort Claims Under the FTCA

The Court begins its consideration of Dr. Coulibaly's official-capacity tort claims under the FTCA by summarizing the governing framework.  The FTCA serves as a waiver of sovereign immunity and makes the federal government liable to the same extent as a private individual for certain torts of federal employees acting within the scope of their employment.  28 U.S.C. §§ 1346, 2674; *United States v. Orleans*, 425 U.S. 807, 813 (1976).  Because governing law "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties," *Osborn v. Haley*, 549 U.S. 225, 229 (2007), a plaintiff may not bring tort claims against federal officials in their official capacities or against federal agencies; the proper defendant is the United States itself, *see* 28 U.S.C. § 1346(a)(2); *Goddard v. D.C. Redevelopment Land Agency*, 287 F.2d 343, 345–46 (D.C. Cir. 1961); *Welsh v. Hagler*, 83 F. Supp. 3d 212, 223 (D.D.C. 2015).

The FTCA provides the exclusive remedy "[w]here a plaintiff seeks monetary damages against a federal agency for torts committed by federal employees."  *Lempert v. Rice*, 956 F.

Supp. 2d 17, 28 (D.D.C. 2013) (alteration in original) (quoting *Jones v. United States*, 949 F.

Supp. 2d 50, 53 (D.D.C. 2013)); *see also* 28 U.S.C. § 2679(b)(1) (declaring the FTCA remedy

"exclusive of any other civil action or proceeding for money damages").  Failure to name the

United States as the defendant in an FTCA action requires dismissal for lack of subject-matter

jurisdiction. *See, e.g.*, *Johnson v. Veterans Affairs Med. Ctr.*, 133 F. Supp. 3d 10, 17 (D.D.C.

2015); *Cox v. Sec'y of Labor*, 739 F. Supp. 28, 29 (D.D.C. 1990).

For that reason, here, the Court must dismiss Dr. Coulibaly's claims against federal

employees in their official capacities.  Any tort claims based on the employees' official actions

must be considered as claims against the United States; the official-capacity claims against the

employees cannot proceed.  Given that Dr. Coulibaly has, however, also sued the United States,

*see* Compl., the Court now turns to whether Dr. Coulibaly's tort claims against the United States

may proceed under the FTCA.  The Court determines that they cannot, for two principal reasons.

First, federal antidiscrimination statutes preclude consideration of Dr. Coulibaly's

discrimination, retaliation, and emotional distress claims (Counts 7, 16, and 21 of the complaint)

under the FTCA.  For claims of race and national origin discrimination, Title VII "provides the

exclusive judicial remedy . . . in covered federal employment."  *Kizas v. Webster*, 707 F.2d 524,

542 (D.C. Cir. 1983) (brackets and internal quotation marks omitted) (quoting *Brown v. GSA*,

425 U.S. 820, 835 (1976)); *see also* 42 U.S.C. § 2000e-16 (banning discrimination in federal

employment and authorizing judicial relief for violations of that ban).  Thus, allegations of race

and national original discrimination are only actionable under Title VII.  *Myvett v. Williams*, 638

F. Supp. 2d 59, 69–70 (D.D.C. 2009) (citing *Brown*, 425 U.S. at 829; *Ethnic Employees of

Library of Congress v. Boorstin*, 751 F.2d 1405, 1415 (D.C. Cir. 1985)).  Likewise, Title VII

preempts most tort claims alleging discrimination-related infliction of emotional distress.  *See*

*Boyd v. O'Neill*, 273 F. Supp. 2d 92, 96 (D.D.C. 2003) (explaining that "[a]ny emotional injuries arising from [an] alleged [discrimination claim] are subsumed within Title VII," but that this principle does not extend to emotional distress based on "alleged assaultive conduct" or other conduct that Title VII does not redress); *accord Jackson v. Am. Chem. Soc'y*, 812 F. Supp. 239, 243 (D.D.C. 1993); *Stewart v. Thomas*, 538 F. Supp. 891, 895–96 (D.D.C. 1982).[24]

Along similar lines, for disability discrimination claims, the Rehabilitation Act "is the sole judicial remedy for federal employees alleging disability discrimination" and accordingly preempts any emotional distress claim arising from disability discrimination. *Perry v. United States*, No. 14-2862, 2015 WL 3558081, at *3 (D. Md. June 2, 2015) (citing *Brown v. Henderson*, 6 F. App'x 155, 156 (4th Cir. 2011); and *Spence v. Straw*, 54 F.3d 196, 202 (3d Cir. 1995)), *appeal docketed*, No. 16-1129 (4th Cir. Feb. 9, 2016). Here, because Dr. Coulibaly alleges emotional distress arising from discrimination that Title VII and the Rehabilitation Act can remedy, *see* Compl. ¶¶ 144, 147, Title VII and the Rehabilitation Act preempt Dr. Coulibaly's discrimination, retaliation, and emotional distress claims, to the extent they seek

---

[24] Although Count 21 alleges "personal injury," Compl. ¶ 208, the Court construes the Count as alleging only emotional injury, given that Dr. Coulibaly has not alleged any physical harm flowing from the conspiracy asserted in that Count, *see id.*

tort law remedies.[25]  The Court will accordingly dismiss Counts 7, 16, and 21 of Dr. Coulibaly's complaint, to the extent that they allege tort claims against the United States.[26]

Second, to the extent that Dr. Coulibaly may seek to apply the FTCA to his claims of misrepresentation, fraud, defamation, character assassination, promissory fraud, violation of the implied covenant of good faith and fair dealing, and promissory estoppel (asserted in Counts 8–11 and in the first of the two counts labeled "Count 19" in the complaint), those claims cannot proceed because they fall under express statutory exemptions.[27]  The FTCA explicitly specifies that it does not apply to claims "arising out of . . . libel, slander, misrepresentation, deceit or interference of contract rights."  *See* 28 U.S.C. § 2680(h).  Dr. Coulibaly's claims of defamation and "character assassination" fall squarely within the exemptions for libel and slander.  *See Lewis v. Dist. of Columbia*, No. 10-5275, 2011 WL 321711, at *1 (D.C. Cir. Feb. 2, 2011) (per curiam) (noting that "defamation claims are not cognizable under the FTCA"); *Novecon, Ltd. v. Bulgarian-Am. Enter. Fund*, 977 F. Supp. 52, 54 (D.D.C. 1997), *aff'd*, 190 F.3d 556 (D.C. Cir. 1999) (applying defamation law to a claim of "character assassination"); *see also Thomas v. Dep't of Veterans Affairs*, No. 05-5348, 2006 WL 1636738, at *4 (S.D.N.Y. Apr. 3, 2006) (in the

---

[25] The federal antidiscrimination statutes would also preempt any tort claims that Dr. Coulibaly seeks to bring under the Constitution.  *See* Compl. ¶ 147 (alleging a due process violation as one cause of his emotional distress claim, asserted in Count 16 of the complaint).  *See generally Kizas v. Webster*, 707 F.2d 524, 542 (D.C. Cir. 1983) ("The Title VII remedy declared exclusive for federal employees in *Brown v. GSA* precludes actions against federal officials for alleged constitutional violations as well as actions under other federal legislation.").  And, in any event, constitutional tort claims cannot proceed under the FTCA, because the FTCA's grant of sovereign immunity does not extend to constitutional tort claims.  *See FDIC v. Meyer*, 510 U.S. 471, 478 (1994) ("[T]he United States . . . has not rendered itself liable under [the FTCA] for constitutional tort claims.").

[26] The Court discusses the merits of Dr. Coulibaly's Title VII and Rehabilitation Act claims elsewhere in this opinion.  *See infra* Parts III.C–D.

[27] For thoroughness, the Court addresses Dr. Coulibaly's contract-related claims in both the tort and contract contexts.

context of the FTCA, liberally construing *pro se* plaintiff's claim of "character assassination" to mean defamation). His claims of misrepresentation, fraud, and promissory fraud are precluded by the exemptions for misrepresentation and deceit. *See United States v. Neustadt*, 366 U.S. 696, 702 (1961) (holding that the word "deceit" includes fraudulent and negligent misrepresentation); *Chedick v. Nash*, 151 F.3d 1077, 1081–82 (D.C. Cir. 1998) (analyzing "promissory fraud" within the context of fraudulent misrepresentation). As for Dr. Coulibaly's claims for breach of an implied covenant of good faith and fair dealing and promissory estoppel, to the extent that they are construed as tort claims, they fall under the statutory exemption for interference of contract rights. *See Selland v. United States*, 966 F.2d 346, 347 (8th Cir. 1992) (liberally construing facial breach of contract claims as tortious interference with contractual relations, and finding them exempt under the FTCA); *Foster v. Fed. Emergency Mgmt. Agency*, 128 F. Supp. 3d 717, 723 (E.D.N.Y. 2015) (analyzing breach of contract and promissory estoppel claims together in the context of the FTCA). The United States retains immunity from these claims, for FTCA purposes, and courts must dismiss any suits asserting those claims under the FTCA. *See, e.g.*, *Wuterich v. Murtha*, 562 F.3d 375, 381 (D.C. Cir. 2009); *Peter B. v. United States*, 579 F. Supp. 2d 78, 82–83 (D.D.C. 2008); *Edmonds v. United States*, 436 F. Supp. 2d 28, 35 (D.D.C. 2006). The Court will accordingly dismiss Dr. Coulibaly's contract-related, defamation, character assassination, and misrepresentation claims (asserted in Counts 8–11 and in the first of the two counts titled "Count 19" in the complaint), to the extent that they seek relief under the FTCA, because they are barred by statute.

### b. Contract Claims Under the Tucker Act

Having decided that the Court must dismiss Dr. Coulibaly's tort claims against federal employees in their official capacities and against the United States, the Court next analyzes

Dr. Coulibaly's contract claims against the United States and against federal employees in their official capacity.  To that end, the Court once again discusses Counts 8–11 of the complaint, which assert misrepresentation, fraud, promissory fraud, violation of the implied covenant of good faith and fair dealing, and promissory estoppel.  These claims, which Dr. Coulibaly cannot bring under the FTCA, are more properly read as contract claims to which the Tucker Act would apply.  But, even to the extent that they seek relief under the Tucker Act, the Court must still dismiss them for want of jurisdiction.

Under the Tucker Act, Congress waived sovereign immunity with regard to "any claim against the United States . . . upon any express or implied contract with the United States."  28 U.S.C. § 1491(a)(1).  Moreover, the Tucker Act provides the *only* waiver of sovereign immunity for claims arising out of contracts with the United States.  *Schmidt v. Shah*, 696 F. Supp. 2d 44, 61 (D.D.C. 2010).  But the Tucker Act states that "[t]he United States *Court of Federal Claims* shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1) (emphasis added).  If a claimant does not limit the damages sought to an amount at or below $10,000, then the jurisdiction of the Court of Federal Claims is exclusive.  *See Greenhill v. Spellings*, 482 F.3d 569, 573 (D.C. Cir. 2007) ("If [the plaintiff] explicitly or in essence seeks money damages in excess of $10,000, jurisdiction rests exclusively with the Court of Federal Claims."); *cf.* 28 U.S.C. § 1346(a)(2) (stating that the United States district courts exercise concurrent jurisdiction over "[a]ny . . . claim against the United States, *not exceeding $10,000 in amount*, founded . . . upon any express or implied contract with the United States" (emphasis added)).

Here, Dr. Coulibaly has requested an amount greater than the $10,000 jurisdictional cap: in the FTCA claim against the Department of State in which he alleges "Breach of Contract," he

requests $10,000,000 in damages.  *See* Defs.' Facts Ex. CC at 1, ECF No. 30-29.[28]  Because

Dr. Coulibaly's claimed contract-related damages exceed $10,000, the Court must also dismiss

for lack of jurisdiction any contract claims that Dr. Coulibaly seeks to bring against the United

States under the Tucker Act.

*       *       *

In sum, to the extent that Counts 7–11, Count 16, Count 21, and the first of the two

counts labeled "Count 19" in the complaint allege tort or contract claims against the United

States or against individual defendants in their official capacities, the Court must dismiss them.

### 3.  Personal Capacity Claims

The Court now considers whether any of these claims may proceed against the individual

defendants in their personal capacities, given that Dr. Coulibaly states that he is suing all of the

individual defendants, except for Secretary Kerry, in their official and personal capacities.  Pl.'s

Resp. ¶ 155.  In a suit against a federal employee in his personal capacity, unlike one against a

federal employee in his official capacity, the plaintiff need not establish a waiver of sovereign

immunity.  *See, e.g.*, *Majano v. United States*, 469 F.3d 138, 139 (D.C. Cir. 2006) (indicating

that sovereign immunity is not a bar to relief if allegedly tortious conduct occurred outside the

scope of the tortfeasor's employment).  But (1) for lack of proper service and (2) because they

fail to state claims upon which relief may be granted, the Court must also dismiss

Dr. Coulibaly's tort and contract claims against the individual defendants in their personal

capacities.  The Court addresses the service issue before addressing the claims on their merits.

---

[28] In his response to the Defendants' motion, Dr. Coulibaly concedes that the United States is the proper defendant for his FTCA claims.  Pl.'s Resp. ¶ 160.  Consequently, the Court views this FTCA claim as one filed against the United States, even if Dr. Coulibaly initially sought relief from the Department of State.

### a. Lack of Proper Service

In addition to effectuating service on the United States under Federal Rule of Civil Procedure 4(i)(1), a plaintiff who sues government officials in their individual capacities must also personally serve the individual officials themselves. *See* Fed. R. Civ. P. 4(i)(3) ("[A] party must . . . serve the officer or employee under Rule 4(e), (f), or (g)."); *Simpkins v. D.C. Gov't*, 108 F.3d 366, 368–69 (D.C. Cir. 1997) (explaining that in *Bivens* suits, which are "actions against federal officers in their individual capacity, not their official capacity," the defendants "must be served as individuals"). To serve the personal-capacity defendants in this case, therefore, the complaint and the summons must be

(1) delivered to each individual personally, Fed. R. Civ. P. 4(e)(2)(A); or

(2) left at each individual's "dwelling or usual place of abode with someone of suitable age and discretion," Fed. R. Civ. P. 4(e)(2)(B); or

(3) delivered to "an agent authorized by appointment or law to receive service of process," Fed. R. Civ. P. 4(e)(2)(C); or

(4) mailed by "registered or certified mail, return receipt requested," or "by first-class mail, postage prepaid, to the person to be served, together with two copies of a Notice and Acknowledgement . . . and a return envelope, postage prepaid, addressed to the sender," D.C. Super. Ct. R. Civ. P. 4(c)(3), (4); *see* Fed. R. Civ. P. 4(e)(1) (allowing service in accordance with the state law applicable in the state were the district court is located).

Because Dr. Coulibaly is proceeding *in forma pauperis*, however, service shall be made by a United States marshal, by a deputy marshal, or by "a person specially appointed by the court."

Fed. R. Civ. P. 4(c)(3); *see* Feb. 10, 2014 Fiat Order (granting Dr. Coulibaly's motion for leave to proceed *in forma pauperis*).

On the record as it stands, proper service has not been effected on the individual defendants sued in their personal capacities.  As the Defendants correctly note, the United States Marshals Service delivered the summons and complaint for five of the individual defendants (Soloman Atayi, Deborah Duckett, James North, Kristina Medick, and Jennifer Toole) to Krystal Board, a Department of State administrative assistant.  *See* Process Receipts and Returns, ECF No. 4; Mem. Supp. Defs.' Mot. Dismiss or, in the Alt., for Summ. J. ("Defs.' Mem.") at 5–6, ECF No. 30.  According to Defendants, Ms. Board is "a contract Administrative Assistant in the State Department's Office of the Legal Advisor."  Defs.' Mem. at 6.  On this record, none of the four ways of properly serving the individual defendants in their personal capacities has occurred with respect to Defendants Atayi, Duckett, North, Medick, and Toole:

> (1) the complaint and summons were *not* delivered to those defendants personally, *cf.* Fed. R. Civ. P. 4(e)(2)(A);
>
> (2) they were *not* left at each defendant's "dwelling or usual place of abode with someone of suitable age and discretion," Fed. R. Civ. P. 4(e)(2)(B);
>
> (3) because "the Department is not an authorized agent for service of process with respect to civil litigation against Department employees purely in their personal, non-official capacity," 22 C.F.R. § 172.2(c), the complaint and summons were *not* delivered to "an agent authorized by appointment or law to receive service of process," Fed. R. Civ. P. 4(e)(2)(C); and
>
> (4) the complaint and summons were *not* mailed to any of the individual defendants, *cf.* D.C. Super. Ct. R. Civ. P. 4(c)(3), (4).

Further, the record reflects that no service has been attempted on the other individual defendants sued in their personal capacities: Defendants Glenn Budd, Sarah Clement, Jeannette Hilleary, Cynthia G. McKnight, Martin Regan, and Daniel Madden Turbitt.  *Cf.* Process Receipts and Returns, ECF No. 4 (showing delivery of the summons and complaint with respect to Defendants Atayi, Duckett, North, Medick, and Toole only); Process Receipts and Returns, ECF No. 6 (showing delivery of the summons and complaint with respect to the United States only). On this record, none of the individual defendants sued in their personal capacities have been properly served, and Dr. Coulibaly's tort and contract claims cannot proceed against them for lack of proper service.  *See generally Mann v. Castiel*, 681 F.3d 368, 372 (D.C. Cir. 2012) (explaining that the plaintiff has the burden to establish proper service).

Granted, Dr. Coulibaly is *in forma pauperis* and thus not himself responsible for effecting service (even if he does bear the ultimate burden to establish proper service).  *See* Fed. R. Civ. P. 4(c)(3).  But even if Dr. Coulibaly, through the Marshals Service, were given another opportunity to serve the individual defendants sued in their personal capacities, such tort or contract claims against them would fail for other reasons, which the Court discusses below.[29]  As such, re-attempting service would be futile.

---

[29] The Court also notes here that, if the individual defendants sued in their personal capacities were ever served, the United States would have the opportunity to certify under the Westfall Act "that the defendant employee[s] [were] acting within the scope of [their] . . . employment."  28 U.S.C. § 2679(d)(1).  If it did, then the United States would be substituted as the party defendant, *id.*, and any defects with the corresponding FTCA tort claims would be applicable, *see, e.g., Majano v. United States*, 469 F.3d 138, 139 (D.C. Cir. 2006) (explaining that, when the FTCA waiver of sovereign immunity does not cover the particular tort alleged, the plaintiff's "sole hope of success requires that she show [that the alleged tort] was not within the scope of the [federal employee's] employment"); *Ramey v. Bowsher*, 915 F.2d 731, 733–34 (D.C. Cir. 1990) (per curiam) (finding that supervisors were acting within the scope of their employment and were exercising decisionmaking discretion, and therefore concluding that they enjoyed absolute immunity from state-law tort actions).  As discussed above, Dr. Coulibaly's tort and contract claims against the individual defendants in their official capacities cannot proceed

### b.  Expired Limitations Period

The Court first discusses Dr. Coulibaly's "defamation and character assassination" claim (the first "Count 19" in his complaint).  This claim, if asserted against the individual defendants in their personal capacities, is barred by the applicable statute of limitations.  *See* Defs.' Mem. at 28 (making this argument).  It appears that this claim relates to statements made near the end of Dr. Coulibaly's employment at the Department of State, which concluded in April 2012.  *See* Compl. ¶¶ 185–92.  For defamation claims, a one-year limitations period applies in the District of Columbia.  *See* D.C. Code § 12-301(4) (setting a one-year limitations period for libel and slander claims); *Mullin v. Wash. Free Weekly, Inc.*, 785 A.2d 296, 298 (D.C. 2001) (citing D.C. Code § 12-301(4)) (noting that the limitations period "for a defamation claim in the District of Columbia is one year").[30]  That limitations period had accordingly expired by the time that Dr. Coulibaly filed his complaint on February 10, 2014.  *See* Compl.  And the limitations period would also have expired even if, as Dr. Coulibaly claims, he filed his complaint on November 15, 2013.  *See id.* ¶ 162.

### c.  Preemption Under Title VII

Dr. Coulibaly's infliction of emotional distress claims (asserted in Counts 7, 16, and 21 of his complaint) and Dr. Coulibaly's contract claims (asserted in Counts 8–11), on the other

---

under the FTCA, because federal antidiscrimination statutes preempt many of those claims, and because the FTCA's waiver of sovereign immunity does not cover many of the claims alleged. *See supra* Part III.B.2.a.

[30] Dr. Coulibaly has not alleged that Maryland law should apply to his defamation claim. *See* Compl. ¶¶ 184–92; Pl.'s Resp. ¶¶ 504–12; *cf.* Compl. ¶ 19 (alleging that Dr. Coulibaly is a Maryland resident).  But even if Maryland law did apply, a one-year limitations period would apply under Maryland law as well.  *See* Md. Code Ann., Cts. & Jud. Proc. § 5-105 ("An action for . . . libel, or slander shall be filed within one year from the date it accrues."); *McClure v. Lovelace*, 78 A.3d 934, 949 (Md. 2013) ("In Maryland, the statute of limitations for defamation is one year from the date of accrual.").

hand, cannot proceed against the individual defendants in their personal capacities for a reason already mentioned: Title VII preempts those claims. *See supra* Part III.B.2.a (explaining, in the context of tort claims against the United States, that Title VII preempts most discrimination-related emotional distress claims). In a case in which "the same set of facts supports a Title VII claim and a non-Title VII claim against a federal employer, the Title VII claim preempts the non-Title VII claim." *Bergbauer v. Mabus*, 810 F. Supp. 2d 251, 260 (D.D.C. 2011) (internal quotation marks omitted) (quoting *Mathis v. Henderson*, 243 F.3d 446, 450–51 (8th Cir. 2001)). This preemptive effect applies both to non-Title VII federal law claims and to common law tort and contract claims. *See King v. Holder*, 941 F. Supp. 2d 83, 92 (D.D.C. 2013) (explaining that Title VII preempts "both [federal] constitutional claims and common law tort claims arising out of the same conduct that forms the basis for a plaintiff's Title VII claim"); *Berio v. EEOC*, 446 F. Supp. 171, 173–74 (D.D.C. 1978) (finding that Title VII precluded a plaintiff's claims under 42 U.S.C. § 1981 and the Fifth Amendment); *Smith v. Lujan*, 780 F. Supp. 1275, 1279 (D. Ariz. 1991) (finding that Title VII precluded the plaintiff's due process and breach of contract claims); *Carver v. Casey*, 669 F. Supp. 412, 417 (S.D. Fla. 1987) ("[T]he gist of plaintiff's "breach of contract" claims is employment discrimination, for which Title VII stands as a federal employee's exclusive remedy."). And Title VII's preemptive effect "is the same as to claims against individual supervisors as it is for claims against federal agencies themselves." *Bergbauer*, 810 F. Supp. 2d at 260; *see also Mathis*, 243 F.3d at 450 (holding that the plaintiff could not "bring state-law claims against [her supervisor] arising out of the same facts [as her

employment discrimination claim] simply by labeling them as something other than employment discrimination claims").[31]

Here, Dr. Coulibaly's emotional distress and contract claims derive from the same facts as his Title VII claims. For his infliction of emotional distress claim (Count 7 of his complaint), Dr. Coulibaly draws on the same facts to support that claim as the ones used to support his hostile work environment claim. *See* Compl. ¶¶ 106–09. His contract claims in Counts 8–11 of his complaint likewise derive from facts used to support claims of discrimination. *Compare id.* ¶¶ 37–103 (using facts relating to Dr. Coulibaly's time as a contractor to support claims of discrimination), *with id.* ¶¶ 110–17 (using the same facts to support his contract claims). And Dr. Coulibaly expressly alleges Title VII violations as the basis for his emotional distress claim in Count 16 of his complaint. *See id.* ¶ 147.[32] Lastly, Dr. Coulibaly's emotional distress claim

---

[31] The Court acknowledges that older opinions in this district indicate that Title VII does not preempt tort claims against federal supervisors in their personal capacities, even if those claims derive from the same facts as related employment discrimination claims. *See Epps v. Ripley*, No. 81-0588, 1982 WL 514, at *1 (D.D.C. Mar. 11, 1982); *Neely v. Blumenthal*, 458 F. Supp. 945, 954–55 (D.D.C. 1978). But given the more recent opinions holding otherwise, the Court finds that the older opinions have not "withstood the test of time nor the thrust of new caselaw." *Kittner v. Gates*, 708 F. Supp. 2d 47, 53 (D.D.C. 2010) (discussing *Neely*).

[32] Title VII also preempts consideration of any constitutional due process claim against individual defendants in their personal capacities. *See Kizas v. Webster*, 707 F.2d 524, 542 (D.C. Cir. 1983) ("The Title VII remedy declared exclusive for federal employees in *Brown v. GSA* precludes actions against federal officials for alleged constitutional violations . . . ."); *Kittner*, 708 F. Supp. 2d at 53–54 (dismissing constitutional claims that challenged the same acts as those challenged by the plaintiff's Title VII claims); *Berio v. EEOC*, 446 F. Supp.171, 173–74 (D.D.C. 1978) (holding that Title VII's remedies precluded a plaintiff from pursuing claims against an official in his individual capacity under the Fifth Amendment); *cf.* Compl. ¶ 147 (alleging due process violations in Count 16 of the complaint).

Nor may Dr. Coulibaly sue federal officials in their personal capacities under Title VII, the Americans with Disabilities Act ("ADA"), or the Rehabilitation Act. *See Ndzerre v. WMATA*, No. 15-1229, 2016 WL 1225599, at *5 (D.D.C. Mar. 23, 2016) (citing *Gary v. Long*, 59 F.3d 1391, 1399 (D.C. Cir. 1995)) ("Supervisory employees may only be sued in their official capacity, because employers alone are liable for Title VII violations."); *Di Lella v. Univ. of D.C. David A. Clarke Sch. of Law*, 570 F. Supp. 2d 1, 7 n.8 (D.D.C. 2008) ("[T]here is no individual liability under the ADA or the Rehabilitation Act."); *accord Richardson v. Yellen*, No. 14-1673,

in Count 21 relies on the same conspiracy allegations he asserted in the context of a discrimination claim. *Compare id.* ¶¶ 207–08 (alleging that "conspiracy, collusion and machination between . . . agencies" is evidence of infliction of emotional distress), *with id.* ¶¶ 197–206 (alleging discriminatory conspiracy), *and* Defs.' Facts Ex. W, at 2, ECF No. 30-23 (showing that Dr. Coulibaly alleged, in the context of an administrative discrimination complaint, that the Department of State conspired with the MSPB).

Because Dr. Coulibaly's tort and contract claims derive from the same facts as his Title VII claims, Title VII would preempt consideration of those claims against individual defendants in their personal capacities. *See Mathis*, 243 F.3d at 450 (explaining that the Supreme Court's holding in *Brown v. GSA*, 425 U.S. 820 (1976), prevents courts from allowing a plaintiff to sue a supervisor "individually, for the consequences of the same acts that [he] alleges to be [discrimination] under federal law"); *cf. id.* ("The situation would be different if [the plaintiff] were relying on altogether different incidents to support [his] state-law claims, with no intention of using evidence of the same incidents to prove . . . the Title VII [claims] . . . ."). Thus, even if all the individual defendants were properly served, Dr. Coulibaly's tort and contract claims against them could not proceed.

---

2016 WL 890570, at *9 (D.D.C. Mar. 8, 2016) (discussing the Rehabilitation Act); *Hillware v. Snyder*, 151 F. Supp. 3d 154, 157–58 (D.D.C. 2015) (discussing Title VII); *cf.* Compl. ¶ 147 (alleging Title VII, ADA, and Rehabilitation Act violations in Count 16 of the complaint). And to the extent that Dr. Coulibaly seeks to bring claims under 5 U.S.C. § 2302(b) or 5 C.F.R. § 1201.56, those authorities do not contain a private right of action. *See* 5 U.S.C. § 2302(b)(1) (prohibiting discrimination in federal employment, but without establishing a right to sue); 5 C.F.R. § 1201.56 (discussing the burden of proof in MSPB administrative cases); *cf.* Compl. ¶ 147 (alleging violations under these authorities in Count 16 of the complaint).

\*      \*      \*

None of Dr. Coulibaly's tort or contract claims are legally cognizable against individual defendants in their personal capacities, even if Dr. Coulibaly had properly served them.  And, as discussed earlier, those claims also cannot proceed against the United States or against individual defendants in their official capacities.  *See supra* Part III.B.2.  The Court will accordingly dismiss in their entirety Counts 7–11, Count 16, Count 21, and the first "Count 19" in Dr. Coulibaly's complaint, to the extent that those claims allege tort or contract claims.

## C.  Title VII

The Court now turns to those of Dr. Coulibaly's claims that could be construed to allege claims under Title VII of the Civil Rights Act of 1964.  The following counts of the complaint appear to request relief under Title VII:

(1)   Count 1, which alleges discrimination based on FSI's failure to hire Dr. Coulibaly on June 15, 2007, *see* Compl. ¶¶ 97–98;

(2)   Count 2, which alleges discrimination based on FSI's failure to promote Dr. Coulibaly on June 15, 2007, *see id.* ¶ 99;

(3)   Count 3, which alleges "discrimination based on race and color" generally, *see id.* ¶¶ 100–01;

(4)   Count 4, which alleges disparate-treatment discrimination in connection to FSI's choice "to hire another teacher with less seniority, less experience, [and] less education," *id.* ¶¶ 102–03;

(5)   Count 5, which alleges reprisal and retaliation in "violation of Title VII . . . as well [as] the First Amendment" based on Dr. Coulibaly's "political activities related to his country of origin," *id.* ¶¶ 104–05;

(6)     Count 6, which alleges a "hostile and abusive working environment . . . in violation of Title VII," *id.* ¶¶ 106–07;

(7)     Count 13, which alleges wrongful discharge, *see id.* ¶¶ 127–29;

(8)     Count 14, which concerns Dr. Coulibaly's "third EEOC complaint of retaliation and discrimination," *id.* ¶¶ 130–139;

(9)     Count 15, which alleges that MSPB judges committed conspiracy in violation of 42 U.S.C. § 1985, *see id.* ¶¶ 140–42;[33]

(10)    Count 16, which asks the Court to review his retaliation claims relating to events that occurred in 2009, *see id.* ¶¶ 143–64; and

(11)    Count 20, which broadly alleges conspiracy, due process violations, abuse of process, procedural error, retaliation, discrimination, and infliction of emotional distress under 42 U.S.C. § 1985, *see id.* ¶¶ 197–206.

The Court reviews the applicable legal standard before turning to the merits of these claims.

## 1.  Legal Standard

When, on a motion to dismiss, "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56" and the parties "must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  Here, both parties have submitted evidence outside the pleadings in support of their positions, and they rely on them when discussing

---

[33] Although Count 15 seeks to bring a claim under 42 U.S.C. § 1985, the claim asserted appears to derive from the same facts as Count 14, which explicitly alleges retaliation and discrimination.  *See* Compl. ¶¶ 130–42.  The Court therefore addresses both counts within Title VII's conceptual framework.  *See generally Kizas v. Webster*, 707 F.2d 524, 542 (D.C. Cir. 1983) ("The Title VII remedy declared exclusive for federal employees in *Brown v. GSA* precludes actions against federal officials . . . under other federal legislation.").

Dr. Coulibaly's Title VII claims.  *See, e.g.*, Defs.' Mem. 11–23; Pl.'s Resp. ¶¶ 9–16.  And though it is improper to convert a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction into a motion for summary judgment, *see Ord v. Dist. of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009), Defendants' arguments about Dr. Coulibaly's Title VII claims do not assert that this Court lacks jurisdiction over those claims, *see* Def.'s Mem. 8 (acknowledging Title VII claims against Secretary Kerry in his official capacity); *see also id.* at 32–40 (addressing the substance of the claims).  Therefore, the Court considers Defendants' substantive Title VII arguments under the Rule 56 legal standard applicable to motions for summary judgment.

Given that Defendants' motion comes before discovery has commenced in this case, the Court pays special heed to the principle that, typically, "summary judgment may not be granted until all parties have had a full opportunity to conduct discovery." *United States ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 25 (D.C. Cir. 2014) (internal quotation marks omitted) (quoting *Convertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012)).  This principle is particularly relevant in a Title VII case, where "discovery may even uncover direct evidence of discrimination, thus entirely eliminating the need to prove a prima facie case." *Chappell-Johnson v. Powell*, 440 F.3d 484, 488–89 (D.C. Cir. 2006).  Nonetheless, to analyze whether pre-discovery summary judgment might be proper here, the Court will analyze Defendants' arguments on their merits, using the legal standard applicable to Rule 56 motions for summary judgment.  *Cf. Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1032 (D.C. Cir. 2003) (explaining that summary judgment "ordinarily" is proper only after discovery (quoting *Americable Int'l, Inc. v. Dep't of Navy*, 129 F.3d 1271, 1274 (D.C. Cir. 1997))).

Under Rule 56 of the Federal Rules of Civil Procedure, a court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The inquiry under Rule 56 is essentially "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

The principal purpose of summary judgment is to determine whether there is a genuine need for trial by disposing of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324. The non-movant may not rest upon mere allegations or denials but must instead present affirmative evidence. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (citing *Anderson*, 477 U.S. at 256–57).

In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence." *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). All underlying facts and inferences must be analyzed in the light most favorable to the non-movant. *See Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered

Case 1:14-cv-00189-RC   Document 47   Filed 09/30/16   Page 55 of 102

without any evidentiary support do not establish a genuine issue for trial.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

### 2.  Proper Defendant

Before proceeding, the Court discusses whether Dr. Coulibaly may pursue any Title VII claims brought against defendants other than Secretary Kerry, given that Dr. Coulibaly states that he sues all the defendants—save Secretary Kerry—in their personal and professional capacities. Pl.'s Resp. ¶ 155.  The head of the agency is the only proper defendant in a Title VII action.  42 U.S.C. § 2000e-16(c); *Davis v. Califano*, 613 F.2d 957, 958 n.1 (D.C. Cir. 1980); *Davis v. Geithner*, 919 F. Supp. 2d 8, 16 (D.D.C. 2013).  "[W]hile a supervisory employee may be joined as a party defendant in a Title VII action, that employee must be viewed as being sued in his [or her] capacity as the agent of the employer, who is alone liable for a violation of Title VII."  *Gary v. Long*, 59 F.3d 1391, 1399 (D.C. Cir. 1995).  Moreover, Title VII does not impose liability on individuals in their personal capacities; a claim against a supervisor "essentially merges" with any claim against the employer itself.  *Id.*  For this reason, the Court will permit only Dr. Coulibaly's Title VII claims against Secretary Kerry in his official capacity to proceed, and the Court will dismiss Dr. Coulibaly's Title VII claims against the other defendants.

### 3.  Exhaustion

For the Title VII claims against Secretary Kerry, the Court must undertake an additional preliminary analysis.  Because Defendants contend that the Court should dismiss many of Dr. Coulibaly's Title VII claims because he failed to exhaust administrative remedies, *see* Defs.' Mem. at 10–11, 14 n.7, the Court addresses exhaustion before addressing the merits of the Title VII claims.

A federal employee seeking to bring a claim under Title VII must first exhaust his administrative remedies. *See* 42 U.S.C. § 2000e-16(c) (stating that plaintiffs may bring suit only (1) "[w]ithin 90 days of receipt of notice of final action taken by a department, agency, or unit . . . , or by the [EEOC] upon an appeal from a decision or order of such department, agency or unit" or (2) "after one hundred and eighty days from the filing of the initial charge with the department, agency, or unit or with the [EEOC]"); *Scott v. Johanns*, 409 F.3d 466, 468 (D.C. Cir. 2005) ("[B]efore filing suit, an individual alleging that a federal agency engaged in employment discrimination must seek administrative adjudication of the claim."). Additionally, the employee must contact an EEO counselor within forty-five days of the alleged discriminatory action. *See* 29 C.F.R. § 1614.105(a)(1); *accord Greer v. Paulson*, 505 F.3d 1306, 1316–17 (D.C. Cir. 2007).

That initial contact with a counselor triggers a set of events leading to a final agency action, after which the employee (if displeased with that action) may file suit in federal district court. *See* 29 C.F.R. § 1614.105(d)–(f) (stating that the EEO counselor must give the employee notice of his right to file an administrative discrimination complaint with the employing agency); *id.* § 1614.110 (describing final actions that agencies may take with respect to their employees' administrative discrimination complaints); *id.* § 1614.407(a) (stating that employees may file suit in federal district court ninety days after a final agency action). If the agency does not take action within 180 days after an employee files a discrimination complaint with the agency, then the employee may file suit in federal district court regardless. *See id.* § 1614.407(b). In any civil action, a plaintiff must restrict his claims to those that are "like or reasonably related to" allegations made before an administrative body. *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (internal quotation mark omitted) (quoting *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)).

A plaintiff may escape the forty-five-day time limit for contacting an EEO counselor in two ways.  First, the agency must extend the forty-five-day time limit in certain circumstances: (1) when the employee "shows that he . . . was not notified of the time limits and was not otherwise aware of them," (2) when the employee "did not know and reasonably should not have . . . known" that the alleged discriminatory action had occurred, or (3) when "despite due diligence he . . . was prevented by circumstances beyond his . . . control from contacting the counselor within the time limits."  *See* 29 C.F.R. § 1614.105(a)(2).  Second, the time limits applicable to plaintiffs' exhaustion responsibilities are separately subject to equitable doctrines, such as tolling and estoppel.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *accord* 29 C.F.R. § 1614.604(c).  Generally, courts allow tolling "only in extraordinary and carefully circumscribed instances."  *Dyson v. Dist. of Columbia*, 710 F.3d 415, 421 (D.C. Cir. 2013) (internal quotation marks omitted) (quoting *Smith–Haynie v. Dist. of Columbia*, 155 F.3d 575, 579–80 (D.C. Cir. 1998)).  The plaintiff must show "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing."  *Id.* (alterations omitted) (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)).

The Court applies these principles to Dr. Coulibaly's Title VII claims, grouped by time period.  The Court begins with claims relating to the Department's decision not to hire Dr. Coulibaly in 2007, asserted in Counts 1–5 of the Complaint.  *See* Compl. ¶¶ 97–105.[34]  The

---

[34] Although the complaint describes "Count 3" and its claim of "discrimination based on race and color" broadly, without confining Count 3 to any particular adverse employment action, Count 3 appears alongside claims made with respect to FSI's failure to hire Dr. Coulibaly in 2007.  *See* Compl. ¶¶ 97–103.  The Court will therefore analyze Count 3 in the context of claims made about the FSI's actions in 2007, as Defendants do in their motion.  *See* Defs.' Mem. 10. To the extent that Count 3 alleges wrongdoing with respect to Dr. Coulibaly's later employment or his ultimate termination, the Court analyzes those claims in the context of Dr. Coulibaly's hostile work environment claim (Count 6 of the complaint), *see* Compl. ¶¶ 106–07, or in the

Court then analyzes whether Dr. Coulibaly exhausted his administrative remedies for claims

relating to the Department's decision not to hire him in 2009, asserted in Count 16.  *See id.*

¶ 161.[35]  And the Court also briefly discusses whether Dr. Coulibaly exhausted administrative

remedies for (1) his hostile work environment claim, asserted in Count 6, *see id.* ¶¶ 106–07;

(2) his wrongful discharge claim relating to his termination in 2012, asserted in Count 13, *see id.*

¶¶ 127–29; and (3) his claims relating to events after his termination, asserted in Counts 14–15

and 20, *see id.* ¶¶ 130–42, 197–206.

### a. Failure to Hire or Promote in 2007

Dr. Coulibaly's claims in Counts 1–5 of his complaint allege that he was subjected to

discrimination on the basis of race, color, and national origin because FSI did not hire or promote

him in 2007.  *Id.* ¶¶ 97–105.  But the record indicates that only one of Dr. Coulibaly's

administrative complaints against the Department of State related to events that occurred in

2007, and that complaint merely alleges discrimination based on the Department of State's

---

context of Dr. Coulibaly's wrongful discharge claim (Count 13 of the complaint), *see id.*
¶¶ 127–29.

Likewise, because Count 4 appears to allege disparate-treatment discrimination based on
the same failure to hire discussed in Counts 1 and 2 of the complaint, *see id.* ¶¶ 97–99
(discussing failure to hire or promote in 2007), the Court discusses it in the context of the claims
related to FSI's actions in 2007.

Count 5 similarly appears to allege a Title VII violation based on the same 2007 events.
Those events included discussions about Dr. Coulibaly's political speech.  *See supra* Part II.A.2.
Given that Count 5 primarily focuses on that political speech, Count 5's allusion to a Title VII
violation appears to, like Counts 1–4, derive from events that occurred in 2007.  Because
Dr. Coulibaly alleges both Title VII and First Amendment retaliation in Count 5, *see* Compl.
¶ 105, the Court addresses Count 5 under both bodies of law.

[35] Although Count 16 generally alleges tort claims, claims under the FTCA, and
violations of various federal statutes, *see* Compl. ¶¶ 144–47, Dr. Coulibaly asks the Court to
review Title VII claims related to 2009 events in a paragraph within Count 16.  *See* Compl.
¶ 161.  The Court therefore addresses Count 16 in the Title VII context, as well as in the tort and
contract context.

*submission* of a 2007 hiring document to the MSPB.  *See supra* Part II.C (discussing

Dr. Coulibaly's discrimination claim with the Department of State filed under EEO Case

Number DOS-F-119-13); *see also* Defs.' Facts Ex. V, ECF No. 30-22 (discussing the claim in

the Department's dismissal letter).  The submission of a 2007 hiring document during a later

MSPB investigation is not connected to claims of discriminatory failure to promote or hire in

2007.  Because Dr. Coulibaly did not submit an administrative claim encompassing his actual

non-selection for a position in 2007, Dr. Coulibaly failed to exhaust available administrative

remedies on Counts 1–5 of the complaint, and the Court must enter judgment for Defendants on

those counts, to the extent that they raise Title VII claims.  *See Park*, 71 F.3d at 907–08; *Massey*

*v. Gray*, 85 F. Supp. 3d 104, 108 (D.D.C. 2015).

### b.  Failure to Hire or Promote in 2009

Within Count 16 of his complaint, Dr. Coulibaly asks the Court to review his retaliation

claims relating to events occurring in 2009.  *See* Compl. ¶ 161.  In doing so, Dr. Coulibaly

concedes that he did not timely bring those claims to the Department's attention.  *See id.*; *see*

*also* Formal Compl. of Discrimination, EEO Investigation Report at 62–64, ECF No. 36-3

(bringing the claims before the Department in 2011).  But Dr. Coulibaly contends that "he had

valid excuses" for this delay, because he "was not aware of his rights and was in fear of [losing]

his job." Compl. ¶ 161.  Disagreeing, Defendants argue that Dr. Coulibaly's excuses do not

entitle him to revive his untimely claims.  *See* Defs.' Mem. at 14–17.

In this circuit, courts toll time limits in Title VII cases "when complainants neither knew

nor had reason to know about the limit."  *Dyson v. Dist. of Columbia*, 710 F.3d 415, 421 (D.C.

Cir. 2013) (quoting *Bowden v. United States*, 106 F.3d 433, 438 (D.C. Cir. 1997)).  This

principle aligns with the regulation that governs agencies' initial administrative processing of

discrimination and retaliation complaints.  That regulation directs agencies to "extend the 45-day time limit" for complainants to initiate contact with the agency when the complainant "shows that he or she was not notified of the time limits and was not otherwise aware of them."  29 C.F.R. § 1614.105(a)(2); *see also Harris v. Gonzales*, 488 F.3d 442, 444–46 (D.C. Cir. 2007) (tolling the forty-five-day limit based on the language of the regulation).  Here, Dr. Coulibaly alleges that he "was not aware of his rights" because, as a contractor in 2009, he received no training about equal employment opportunity laws.  Compl. ¶ 161.  Given that the non-movant's evidence must be believed on summary judgment, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), Dr. Coulibaly has made a preliminary showing that he "neither knew nor had reason to know" about the applicable time limit, *Dyson*, 710 F.3d at 421 (quoting *Bowden*, 106 F.3d at 438).

Defendants do not rebut this showing by arguing that "subjective ignorance alone does not automatically entitle [Dr. Coulibaly] to the exception."  Defs.' Mem. at 16 (internal quotation mark omitted) (quoting *Johnson v. Runyon*, 47 F.3d 911, 918 (7th Cir. 1995)).  Although they appear to argue that the Court should impute constructive notice to Dr. Coulibaly because "he worked for the agency for approximately 13 years," *id.*, Defendants do not assert the necessary facts to allow the Court to find constructive notice.  To do so, Defendants, as summary judgment movants, must show (1) that "notification of the time requirements was provided" and (2) that the notification was "reasonably geared to inform the complainant of the time limits."  *Harris*, 488 F.3d at 445 (internal quotation marks omitted) (quoting *Johnson*, 47 F.3d at 918).  They have done neither.  *See* Defs.' Mem. at 14–17.  Nor do they offer any response to the notion that Dr. Coulibaly received no training about equal employment opportunity laws during his time as a contractor.  *See id.*

On this record, the Court determines that there is at least a genuine issue of material fact with respect to whether the forty-five-day time limit for bringing discrimination and retaliation allegations should apply to Dr. Coulibaly.  Dr. Coulibaly, a contractor for the Department in 2009, may not have received the "employee handbooks, orientation sessions, etc." that the Department might have customarily provided its actual employees at the time, to notify them about their obligations under the equal employment opportunity laws.  *Cf. Harris*, 488 F.3d at 445 (citing handbooks, orientation sessions, and the like as evidence that could be used to impute constructive notice of the forty-five-day time limit).  Because Defendants have not provided any evidence to show that he did, the Court cannot impute constructive notice of the time limit to Dr. Coulibaly.  And because Defendants do not dispute Dr. Coulibaly's contention that he subjectively "was not aware of his rights," Compl. ¶ 161; *see* Defs.' Mem. 14–17, the Court finds at least a genuine issue of fact with respect to whether Dr. Coulibaly "neither knew nor had reason to know" about the applicable time limit.  *Dyson*, 710 F.3d at 421 (quoting *Bowden*, 106 F.3d at 438).

If Dr. Coulibaly did not know about the time limit and if he never received even constructive notice of the time limit from the Department, then the Court must toll the time limit—at least until the point at which he received notice.  Because an issue of fact precludes the Court's decision on this issue at this time, the Court cannot summarily determine that Dr. Coulibaly failed to exhaust administrative remedies with respect to his 2009 claims.  The Court will therefore proceed to consider the merits of those claims. Before doing so, the Court pauses to briefly finish its exhaustion analysis.

*c. Hostile Work Environment, Termination in 2012, and Post-Termination Allegations*

The record indicates that Dr. Coulibaly has exhausted administrative remedies for his other discrimination claims. *See* Defs.' Facts Ex. II, at 2, ECF No. 30-35 (showing that the Department's Office of Civil Rights agreed to process Dr. Coulibaly's hostile work environment claim); *id.* at 10 (showing that the Office agreed to process his discrimination and retaliation claims relating to his 2012 termination); Defs.' Facts Ex. W, ECF No. 30-23 (showing that Dr. Coulibaly satisfied the EEO counseling requirement for his allegations related to events after his termination). *Contra* Defs.' Mem. at 30. The Court will accordingly consider those claims on their merits as well.

### 4. Title VII Principles

Before considering the merits of Dr. Coulibaly's Title VII claims relating to events in 2009 and later, however, the Court summarizes some governing principles. Title VII declares that "[a]ll personnel actions affecting employees . . . in executive agencies . . . shall be made free from any discrimination based on race . . . [or] sex . . . ." 42 U.S.C. § 2000e-16. These provisions extend to federal employees "the full rights available in the courts as are granted to individuals in the private sector." *Loeffler v. Frank*, 486 U.S. 549, 558–59 (1988) (internal quotation marks omitted) (quoting *Chandler v. Roudebush*, 425 U.S. 840, 841 (1976)). These rights include those under Title VII's antiretaliation provision, which "forbids employer actions that 'discriminate against' an employee . . . because he has 'opposed' a practice that Title VII forbids or has 'made a charge . . . or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e-3(a)).

In this circuit, two key cases outline the litigation framework for Title VII discrimination and retaliation cases: *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); and *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008).  The three-part *McDonnell Douglas* burden-shifting framework applies when a Title VII plaintiff offers only indirect evidence of discrimination or retaliation at summary judgment.  *See Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003) (applying the framework to a discrimination claim); *Morgan v. Fed. Home Mortg. Corp.*, 328 F.3d 647, 650–51 (D.C. Cir. 2003) (applying the framework to a retaliation claim, in addition to a discrimination claim).  Under *McDonnell Douglas*, the plaintiff has the initial burden of production to establish a prima facie case of discrimination; if he does, then the employer must articulate a legitimate, non-discriminatory reason for its action; and if it does, then the plaintiff must receive an opportunity to show that the employer's reason was a pretextual cover for discrimination.  411 U.S. at 802–05.  Although *McDonnell Douglas* shifts the burden of production between the parties, the plaintiff retains the burden of persuasion.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993).

In the D.C. Circuit, *Brady* streamlines the *McDonnell Douglas* framework when, in considering a motion for summary judgment, the Court immediately observes that a plaintiff suffered an "adverse employment action" and that his employer asserted a "legitimate, non-discriminatory reason" for the alleged discrimination or retaliation.  *See* 520 F.3d at 494; *see also Jones v. Bernanke*, 557 F.3d 670, 678–79 (D.C. Cir. 2009) (explaining that *Brady*'s "principles apply equally to retaliation claims").  That is the case for most of the Title VII claims at issue here: Dr. Coulibaly suffered adverse employment actions when FSI failed to hire him on multiple occasions and when FSI terminated his employment.  *See Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (listing possible adverse employment actions, and including

"firing" as one of them (quoting *Taylor*, 350 F.3d at 1293)).  And Defendants have asserted

various legitimate non-discriminatory reasons for those actions.  *See* Def.'s Mem. 13–17, 32–40.

In this case, therefore, *Brady* directs the Court to forgo *McDonnell Douglas* and instead

to resolve one central question when considering Dr. Coulibaly's discrimination and retaliation

claims: "Has the employee produced sufficient evidence for a reasonable jury to find that the

employer's asserted non-discriminatory or [non-retaliatory] reason was not the actual reason and

that the employer intentionally discriminated against the employee on the basis of race . . . or

national origin [or retaliated against him because of his protected Title VII activity]?"  *Brady*,

520 F.3d at 494; *see also McGrath v. Clinton*, 666 F.3d 1377, 1383 (D.C. Cir. 2012) (adopting

*Brady*'s formulation in a retaliation case).  Phrased in terms of the facts of this case, the Court

must consider whether Dr. Coulibaly has produced sufficient evidence for a reasonable jury to

find (1) that Defendants' proffered reasons were "not the actual reason[s]" for the adverse

employment actions taken against him and (2) that FSI intentionally discriminated against

Dr. Coulibaly on the basis of his protected class, or retaliated against him because he opposed a

practice made unlawful under Title VII.  To answer these questions, the Court must examine the

totality of the evidence and ask "whether the jury could infer discrimination [or retaliation] from

the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to

attack the employer's proffered explanation for its actions; and (3) any further evidence of

discrimination [or retaliation] that may be available to the plaintiff . . . or any contrary evidence

that may be available to the employer."  *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir.

2012) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)); *see*

*also Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004) (adopting this formulation for both discrimination and retaliation claims).[36]

### 5. Discrimination

The Court now analyzes the merits of Dr. Coulibaly's discrimination claims, as alleged in Counts 13, 14, 15, and 20 of his complaint.[37]  The Court begins with Count 13, which relates to Dr. Coulibaly's 2012 termination, before turning to Counts 14, 15, and 20, which all relate to events after his termination.

### a. Termination in 2012

In Count 13, Dr. Coulibaly claims that he was wrongfully discharged "in total violation of [the Department of State's] policy regarding termination."  Compl. ¶¶ 127–29.  The Court construes his claim to include a claim of discrimination on the basis of race, color, and national origin.  *See id.* ¶ 101 (alleging "discrimination based on national origin and also on race and color"); *id.* ¶ 127 (incorporating previous paragraphs in Count 13); *see also* Pl.'s Resp. ¶ 190 (alleging "discriminatory wrongful discharge").  To assess whether to grant Defendants' motion for summary judgment on Dr. Coulibaly's discriminatory discharge claim, the Court must examine the totality of the evidence and ask "whether the jury could infer discrimination from the combination of (1) [Dr. Coulibaly's] *prima facie* case; (2) any evidence [Dr. Coulibaly] presents to attack the [Defendants'] proffered explanation for [their] actions; and (3) any further

---

[36] Legal principles governing Title VII hostile work environment claims are slightly different, and the Court summarizes those later.  *See infra* Part III.C.7.

[37] Count 6 alleges hostile work environment, which the Court discusses later.  *See infra* Part III.C.7.  Counts 13, 14, 15, and 20 appear to allege both discrimination and retaliation, so the Court discusses them under both theories of liability.  *See infra* Part III.C.6 (discussing retaliation).  Count 16, where it seeks review of Dr. Coulibaly's claims relating to 2009 events, alleges that those claims are retaliation claims.  *See* Compl. ¶ 161.  The Court accordingly discusses the merits of those claims in the retaliation context only.

evidence of discrimination that may be available to [Dr. Coulibaly] . . . or any contrary evidence that may be available to the employer." *Hamilton*, 666 F.3d at 1351 (quoting *Aka*, 156 F.3d at 1289). Dr. Coulibaly can meet his burden of production in several ways. *See Brady*, 520 F.3d at 495. He can "suggest[] that the employer treated other employees of a different race, color . . . , or national origin more favorably." *Id.* He can also point to "changes and inconsistencies in the stated reasons for the adverse action; the employer's failure to follow established procedures or criteria; the employer's general treatment of minority employees; or discriminatory statements by the decisionmaker." *Id.* at 495 n.3.

In his complaint and in his brief, Dr. Coulibaly presents evidence "to attack [the Department of State's] proffered explanation for its actions" and to highlight "further evidence of discrimination." *See Hamilton*, 666 F.3d at 1351 (quoting *Aka*, 156 F.3d at 1289). Dr. Coulibaly correctly observes that the Defendants failed to address, in their motion and in their reply, certain evidence within the EEO Report of Investigation that was created in response to his 2011 discrimination complaints and that includes several of his former colleagues' affidavits. *See* Defs.' Mem. 32–35 (omitting any discussion of the affidavits on record from Dr. Coulibaly's former colleagues); Pl.'s Resp. ¶ 117 (accusing Defendants of "ignor[ing] the context of facts").[38] He further observes that, because the Defendants also cited to the same EEO Report of Investigation, they are well aware of those affidavits. *See id.* ¶ 185.

Upon reviewing the affidavits, the Court finds that they do at least call into question one of FSI's legitimate, non-discriminatory reasons for terminating Dr. Coulibaly: his alleged

---

[38] Dr. Coulibaly often refers to an EEO Report of Investigation ("ROI") without identifying which EEO case to which the ROI corresponds. Given that the only EEO Report of Investigation cited in the record is the one generated in response to EEO Case Number DOS-F-025-12, the Court will assume that "ROI" refers to that report. *See supra* note 5 (describing the report).

"inappropriate interactions with [his] supervisors."  Defs.' Facts Ex. I, ECF No. 30-9

(reproducing Dr. Coulibaly's termination letter).  Disagreeing with that view of Dr. Coulibaly's

demeanor, one former colleague stated that Dr. Coulibaly "kept treating his supervisor

professionally" and "kept posting lesson plans for every week even though his lesson plans had

never satisfied his supervisor."  Cazeau Aff. ¶ Q5, EEO Investigation Report at 1339, *Coulibaly*

*v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-12.  And one of his former

supervisors even noted that Dr. Coulibaly's demeanor had consistently been commendable.  *See*

Richards Aff. ¶ Q3, EEO Investigation Report at 1367, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C.

Mar. 4, 2016), ECF No. 26-12 ("Dr. Coulibaly was, throughout the time I worked with him, a

consummate professional,  . . . and extremely responsive to my guidance and suggestions"); *see*

*also id.* ¶ Q4, EEO Investigation Report at 1367, ("Dr. Coulibaly was not one given to

complaint, but rather to serving the needs of his students.").

     Furthermore, the affidavits, as well as other evidence in the record, support

Dr. Coulibaly's claim that he was subjected to treatment that a reasonable juror could reasonably

infer to be discriminatory.  For instance, Lucie Duran, one of Dr. Coulibaly's former colleagues,

was sympathetic to Dr. Coulibaly's view that LTS Fyfe, Dr. Coulibaly's former supervisor,

"accused [Dr. Coulibaly of] hat[ing] her because her husband was from Cote d'Ivoire."  Duran

Aff. ¶ Q4.b, EEO Investigation Report at 1344, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4,

2016), ECF No. 26-12.  Ms. Duran also opined that FSI management "gave unfounded reasons"

for Dr. Coulibaly's termination.  *Id.* ¶ Q4.c, EEO Investigation Report at 1344.  And another

former colleague states that he witnessed Dr. Coulibaly being "publicly humiliated and silenced

by his supervisor."  Cazeau Aff. ¶ Q6, EEO Investigation Report at 1339–40.  In further support,

Dr. Coulibaly's former supervisor noted that, within FSI's French section, FSI had recently

terminated five language teachers for "highly subjective and dubious reasons."  Richards Aff.

¶ Q3, EEO Investigation Report at 1367.  These affidavits could potentially raise the inference

that LTS Fyfe may have been biased against Dr. Coulibaly based on his national origin.  At a

minimum, Dr. Coulibaly should be given an opportunity to explore these issues during

discovery.

As "further evidence of discrimination," *Hamilton*, 666 F.3d at 1351 (quoting *Aka*, 156

F.3d at 1289, 1291), Dr. Coulibaly also has evidence supporting his allegation that the

Department of State "treated other employees of a different . . . national origin more favorably,"

*Brady*, 520 F.3d at 495.  *See supra* Part II.B.2 (discussing Dr. Coulibaly's allegations about

Mr. Hmimiche's preferential treatment).  Former colleagues claim that Mr. Hmimiche, an FSI

employee with a national origin that is different from Dr. Coulibaly's, received better treatment.

*See* Smith Aff. ¶ Q6, EEO Investigation Report at 1365, *Coulibaly v. Kerry*, No. 14-0712

(D.D.C. Mar. 4, 2016), ECF No. 26-12 ("Mr. Hmimiche . . . clear[ly] received preferential

treatment from [Director] Blake and [LTS] Fyfe as he was clearly and evidently not qualified as

a French [l]anguage instructor."); De Launay-Fogg Aff. ¶ Q6, EEO Investigation Report at 1375,

*Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-12 (explaining that

Dr. Coulibaly and Mr. Hmimiche "were treated very differently").  And one former colleague

corroborates Dr. Coulibaly's allegation that he was "singled out" for scrutiny.  *See* Lauterbach

Aff., EEO Investigation Report at 1360, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016),

ECF No. 26-12.  She confirms that, even if Dr. Coulibaly did not timely submit his syllabi at one

point, "approximately fifteen . . . instructors had not posted their current syllabi" either.  *Id.* at

1361.

Based on this evidence, the Court determines that, before giving Dr. Coulibaly an opportunity to explore his allegations during discovery, it would be inappropriate to grant summary judgment on Dr. Coulibaly's discrimination claims relating to his 2012 termination. The Court accordingly will deny Defendants' motion with respect to Count 13, to the extent that it alleges a discriminatory discharge in violation of Title VII. The Court now turns to Dr. Coulibaly's other Title VII discrimination claims.

### b.  Post-Termination Allegations

Counts 14, 15, and 20 of Dr. Coulibaly's complaint all allege that Defendants engaged in unlawful activity in the course of EEOC and MSPB proceedings.  Count 14 appears to seek relief under Title VII.  *See* Compl. ¶ 139 (seeking "all damages available under EEO laws").  Counts 15 and 20 allege violations of 42 U.S.C. § 1985, which provides a right of action to individuals victimized by conspiracies to interfere with their civil rights.  *See* 42 U.S.C. § 1985; Compl. ¶¶140–42 (labeling Count 15 a "Complaint Against MSPB Judges . . . for Conspiracy and Collusion with [the] Department of State to Defraud Plaintiff and Violate His Rights in Violation of . . . 42 U.S.C. [§] 1985(3)"); *id.* ¶ 197 (labeling Count 20 "Conspiracy under color of law, . . . 42 [U.S.C. §] 1985(3)").

The Court need only address these claims briefly, because there is no cause of action against the EEOC or against the MSPB for their processing of discrimination allegations.  *See Woodruff v. McPhie*, 383 Fed. App'x 5, 6–7 (D.C. Cir. 2010); *Smith v. Casellas*, 119 F.3d 33, 34 (D.C. Cir. 1997); *accord Grant v. Dep't of the Treasury*, No. 15-1008, 2016 WL 3365388, at *4 (D.D.C. June 16, 2016); *Harrigan v. Yang*, No. 15-0511, 2016 WL 593447, at *8 (D.D.C. Feb. 12, 2016).  Likewise, 42 U.S.C. § 1985(3) "may not be invoked to redress violations of Title

VII."  *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 378 (1979); *accord Rogler v. Biglow*, 610 F. Supp. 2d 103, 105 (D.D.C. 2009).

Instead of a right to sue the processing agencies under Title VII or under 42 U.S.C. § 1985, Title VII and other governing statutes provide an adequate remedy for Dr. Coulibaly's allegations of wrongdoing: *de novo* review in federal court.  *See Wright v. Dominguez*, No. 04-5055, 2004 WL 1636961, at *1 (D.C. Cir. July 21, 2014) (explaining that "de novo review provides an adequate remedy . . . for complaints about the EEOC's administrative process"); *see also* 5 U.S.C. § 7703(c) (explaining that, "in the case of discrimination" brought on appeal from the MSPB, "the employee . . . shall have the right to have the facts subject to trial de novo by the reviewing court); *Novotny*, 442 U.S. at 376–78 (discussing Title VII's "exclusive remedy for employment discrimination claims" as reason to hold that "deprivation of a right created by Title VII cannot be the basis for a cause of action under §1985(3)").  Because of the opportunity for *de novo* review, "parties suffer no harm if [an administrative agency] conducts an imperfect investigation or inquiry, and consequently have no need to sue the agency for negligence or malfeasance in the processing of claims."  *Harrigan*, 2016 WL 593447, at *8 (internal quotation marks omitted) (quoting *Bagenstose v. Dist. of Columbia*, 503 F. Supp. 2d 247, 255 (D.D.C. 2007)).

Here, Dr. Coulibaly's Counts 14, 15, and 20 request that the Court review federal agencies' handling of his discrimination allegations.  *See* Compl. ¶¶ 130–42, 197–206.  As stated in the authorities discussed above, the Court cannot do so—it may only review *de novo* Dr. Coulibaly's Title VII claims which were the subject of the investigations with which he alleges the agencies conspired to interfere.  Because the law does not allow Dr. Coulibaly to seek relief under an independent cause of action for the EEOC, the Department of State, and the

MSPB's processing of his discrimination allegations, the Court will dismiss Counts 14, 15, and 20 of Dr. Coulibaly's complaint.

*     *     *

Out of Dr. Coulibaly's claims alleging discrete acts of discrimination for which he exhausted administrative remedies, only Dr. Coulibaly's discrimination claim relating to his 2012 termination can proceed. *See* Compl. ¶¶ 127–29 (alleging discriminatory discharge in Count 13 of Dr. Coulibaly's complaint). The Court now turns to Dr. Coulibaly's retaliation claims for which he exhausted administrative remedies. *See id.* ¶¶ 127–42, 161, 197−206 (asserting retaliation claims in Counts 13, 14, 15, 16, and 20 of the complaint).

## 6.  Retaliation

As with Dr. Coulibaly's discrimination claims, the Court addresses Dr. Coulibaly's retaliation claims grouped by time period.  The Court begins by addressing Dr. Coulibaly's retaliation allegations relating to 2009 events, as asserted in Count 16 of his complaint. *See id.* ¶ 161. The Court then addresses whether Dr. Coulibaly may proceed to litigate the claim, asserted in Count 13 of his complaint, that his 2012 termination was retaliatory (in addition to the claim that his 2012 termination was discriminatory). *See id.* ¶ 128.

The Court will not, however, engage in further discussion of Dr. Coulibaly's allegations of agency wrongdoing during the time after his termination, as asserted in Counts 14, 15, and 20 of his complaint. *See* Compl. ¶¶ 130−42, 197−206.  As discussed above, those allegations of wrongdoing aimed at the manner the various agencies processed his Title VII claims, including the retaliation claims that the Court discusses below, are not viable. *See supra* Part III.C.5.b.

The Court accordingly does not discuss Counts 14, 15, and 20 under a retaliation theory of relief; that theory would not change the Court's decision to dismiss those claims.[39]

### a.  Failure to Hire or Promote in 2009

The Court need only briefly address Dr. Coulibaly's retaliation claims relating to 2009 events, asserted in Count 16 of his complaint.  *See* Compl. ¶ 161.  In arguing for dismissal of these claims (or for summary judgment in their favor on these claims), Defendants rest solely on the idea that the claims are untimely.  *See* Defs.' Mem. at 14–17; Defs.' Reply at 11–14.  But, as discussed earlier, the Court cannot conclude on the record presented that the claims were untimely, and so the Court cannot conclude that Dr. Coulibaly therefore did not exhaust his administrative remedies.  *See supra* Part III.C.3.b.  Because Defendants make no further argument for dismissal of retaliation claims relating to 2009 events, the Court will deny Defendants' motion with respect to those claims and will allow the parties to explore those claims in discovery.

### b.  Termination in 2012

The Court turns next to Count 13, which alleges retaliatory (as well as discriminatory) wrongful discharge.  "To prove unlawful retaliation, a plaintiff must show: (1) that he opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action

---

[39] Both in his complaint and in his brief opposing summary judgment, Dr. Coulibaly refers to due process violations in the context of retaliation.  *See, e.g.*, Compl. ¶ 128; Pl.'s Resp. ¶ 419.  But, as noted above, Title VII preempts constitutional claims flowing from alleged employment discrimination.  *See supra* note 23.  And any non-Title VII claims would be preempted by the Civil Service Reform Act ("CSRA"), which prevents federal employees from pursuing claims outside of the CSRA's remedial scheme.  *See Elgin v. Dep't of the Treasury*, 132 S. Ct. 2126, 2133 (2012); *United States v. Fausto*, 484 U.S. 439, 455 (1988); *see also Fornaro v. James*, 416 F.3d 63, 66–67 (D.C. Cir. 2005) ("[S]o far as review of determinations under the CSRA is concerned, what you get under the CSRA is what you get.").  Therefore, the Court does not address any Fifth Amendment due process violations.

against him; and (3) that the employer took the action 'because' the employee opposed the practice." *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012); *see also id.* at 1380 n.3 (explaining that, "[a]lthough these [elements] are often described as the elements that a plaintiff must show to establish a 'prima facie' case of retaliation, . . . they are also the elements that a plaintiff must ultimately prove in order to win his case" (citation omitted)).

For his retaliatory discharge claim, Dr. Coulibaly easily establishes the first two elements of a Title VII retaliation claim.  With respect to the first element, he opposed a practice made unlawful by Title VII when he made contact with the Department of State's Office of Civil Rights and filed an informal discrimination complaint in November 2011.  *See* Compl. ¶ 95 (stating that Dr. Coulibaly filed an informal EEO complaint on November 23, 2011).  *See generally* 42 U.S.C. § 2000e-3(a) (stating that employers may not retaliate against an employee because "he has made a charge" of discrimination); *Borgo v. Goldin*, 204 F.3d 251, 255 & n.4 (D.C. Cir. 2000) (indicating that "official EEO complaints" are protected activities under Title VII).  With respect to the second element, FSI took a materially adverse action by terminating Dr. Coulibaly's employment in April 2012.  *See* Defs.' Facts Ex. I, ECF No. 30-9 (reproducing Dr. Coulibaly's termination letter).  *See generally Baird v. Gotbaum*, 662 F.3d 1246, 1248–49 (D.C. Cir. 2011) (explaining that "the 'adverse action' concept has a broader meaning" in the retaliation context, so that it encompasses at least the "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or . . . significant change in benefits" that are adverse employment actions in the discrimination context (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009))).

And evidence raises at least a genuine issue of fact with respect to the third and final element of the retaliation analysis, the necessary causal link between the two preceding elements.

Title VII retaliation claims, unlike Title VII discrimination claims, "require proof that the desire to retaliate was the but-for cause of the challenged employment action," rather than merely a "motivating factor." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013).  To prevail on his Title VII retaliation claim for wrongful discharge, therefore, Dr. Coulibaly must establish that FSI's unlawful retaliatory animus was not merely *a* cause of his termination, but *the* cause.  *See Rattigan v. Holder*, 982 F. Supp. 2d 69, 81 (D.D.C.2013), *aff'd*, 780 F.3d 413 (D.C. Cir. 2015).  He must prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer"—or, in other words, that the retaliation would not have occurred for any reason other than the employee's opposition to the employer's discriminatory conduct.  *Id.*  To meet this burden, he can offer both direct and circumstantial evidence "from which a reasonable jury could infer the employer's retaliatory intent." *McGrath*, 666 F.3d at 1383.

To that end, Dr. Coulibaly cites to considerable additional evidence that raises genuine issues of material fact with respect to Defendants' proffered non-retaliatory reasons for his termination.  For their part, Defendants rely on Dr. Coulibaly's "outburst at the workshop regarding the French supervisors, his refusal to follow his supervisor's instructions regarding classroom preparation, as well as his abuse of leave procedures" to justify his termination.  Defs.' Mem. at 34–35; *accord* Defs.' Facts Ex. I.  But evidence raises genuine issues of material fact with respect to each of these three reasons.

First, an affidavit from Dr. Coulibaly's former colleague, Elder Cazeau, disputes the idea that Dr. Coulibaly interrupted a training workshop with an "outburst . . . regarding the French supervisors."  Defs.' Mem. at 34; *see* Cazeau Aff. ¶ Q6, EEO Investigation Report at 1339, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-12.  In contrast to

Defendants' claim that Dr. Coulibaly disrupted the meeting, *see* Defs.' Mem. at 33–34,

Mr. Cazeau claims that Dr. Coulibaly "was publicly humiliated and silenced by his supervisor[,]

who told [Dr. Coulibaly] that he could not use the meeting as a platform to air his personal issues

and discuss his personal situation," Cazeau Aff. ¶ Q6, EEO Investigation Report at 1339.

Second, with respect to Dr. Coulibaly's alleged "refusal to follow his supervisor's

instructions regarding classroom preparation," Defs.' Mem. at 34, affidavits support

Dr. Coulibaly's claim that his supervisors held him to different expectations as compared other

FSI employees, *see* Compl. ¶ 121; *accord* De Launay-Fogg Aff. ¶ Q6, EEO Investigation Report

at 1374–76, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-12; Smith Aff.

¶ Q6, EEO Investigation Report at 1365, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4,

2016), ECF No. 26-12.  If Dr. Coulibaly was held to different expectations, then a reasonable

jury might infer that his supervisors' "classroom preparation" expectations were merely a pretext

by which to undermine his perceived performance.  Indeed, Dr. Coulibaly argues that FSI "for

several months was conspiring . . . and looking for a pretext and false accusations to fire him."

Pl.'s Resp. ¶ 119; *see also* Duran Aff. ¶ Q4.c, EEO Investigation Report at 1344, *Coulibaly v.

Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-12 (stating that FSI management "gave

unfounded reasons" for terminating Dr. Coulibaly); De Launay-Fogg Aff. ¶ Q5, EEO

Investigation Report at 1375 ("After Dr. Coulibaly started his EEO complaint, management fell

on him, [and] he was given poor performing classes to prove he was a bad teacher.").

Third, with respect to Defendants' claim that Dr. Coulibaly abused leave procedures,

Defendants point to only one leave request that FSI management ultimately denied: a request for

advance leave on March 29, 2012.  *See* Defs.' Statement ¶¶ 27–28 (noting that Dr. Coulibaly's

"request for advance leave had been denied . . . and that [Dr. Coulibaly] needed to report to

work" on March 29, 2012); Defs.' Mem. at 32–35 (identifying no additional leave requests denied). But some evidence implies that FSI actually approved Dr. Coulibaly's request to take leave on March 29, 2012. *See* Email from Faye Hartgrove (Mar. 28, 2012), EEO Investigation Report at 865, ECF No. 36-4 ("Your memo is approved . . . .").

Moreover, the record suggests that, with respect to the March 29, 2012 leave request, Dr. Coulibaly realized a procedural mistake in his initial request, intended to correct the mistake, and communicated his intentions to his supervisor—who nonetheless chose to forward an incomplete request to FSI management. *See* Email from Tiemoko Coulibaly to Philippe Casteuble (Mar. 29, 2012), EEO Investigation Report at 867–68, ECF No. 36-4 ("I answered by email to you [and said] that I will submit . . . the request [again] on Friday with the appropriate memo and information. So I don't understand why you presented this incomplete request to HR."); *see also* Email from Tiemoko Coulibaly to Philippe Casteuble (Mar. 28, 2012), EEO Investigation Report at 866, ECF No. 36-4 (stating that Dr. Coulibaly would "give [LTS Casteuble] the memo Friday"). And the record suggests that Dr. Coulibaly may have even gone back to work on March 29, 2012 after finding out about the fact that he was absent without leave. *See* Email from Tiemoko Coulibaly to Philippe Casteuble (Mar. 29, 2012, 3:40 PM), EEO Investigation Report at 867 (stating that, having been informed at noon that FSI management had denied his request for advanced sick leave, Dr. Coulibaly would "be at FSI" that day).

All this evidence raises significant questions with respect to whether unlawful Title VII retaliation was the cause of Dr. Coulibaly's termination. To give Dr. Coulibaly an opportunity to explore those questions in discovery, the Court will deny Defendants' motion for summary judgment on Count 13, to the extent that Count 13 raises a Title VII retaliation claim in addition to a Title VII discrimination claim.

7.  Hostile Work Environment

The Court turns now to Dr. Coulibaly's last Title VII claim.  Dr. Coulibaly alleges in Count 6 of his complaint that Defendants forced him to endure a hostile and abusive work environment.  Compl. ¶¶ 106–07.  Because Dr. Coulibaly does not clearly specify whether he brings a *discriminatory* hostile work environment claim or a *retaliatory* hostile work environment claim, *see id.*, the Court analyzes his claim under both theories of relief, which share significant elements in common.  *See generally Faragher v. City of Boca Raton*, 524 U.S. 775, 786–88 (1998) (describing discriminatory hostile work environment claims, which must demonstrate harassment that is so severe or pervasive that it alters the conditions of employment); *Hussain v. Nicholson*, 435 F.3d 359, 366–67 (D.C. Cir. 2006) (describing retaliatory hostile work environment claims, which must also show severe or pervasive harassment).

For a discriminatory hostile work environment claim, the plaintiff can establish a prima facie case by showing (1) that he is a member of a protected class; (2) that he was subject to unwelcome harassment; (3) that the harassment was because of the plaintiff's protected status; (4) that the harassment affected a term, condition, or privilege of employment; and (5) that his employer knew or should have known of the harassment and failed to take action to prevent it. *Lester v. Natsios*, 290 F. Supp. 2d 11, 22 (D.D.C. 2003).  But for a work environment to affect a term, condition, or privilege of employment and thereby be considered "hostile," it must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *accord Baloch v. Kempthorne*, 550 F.3d

1191, 1201 (D.C. Cir. 2008). "The key terms . . . are 'severe,' 'pervasive,' and 'abusive,' as not just any offensive or discriminatory conduct rises to an actionable hostile work environment." *Lester*, 290 F. Supp. 2d at 22 (citing *Oncale*, 523 U.S. at 78).

For a retaliatory hostile work environment claim, the plaintiff must make a similar showing of severe or pervasive harassment. *See Hussain*, 435 F.3d at 366–67. But, instead of establishing (1) the plaintiff's protected class and (2) harassment because of that protected status (elements of a discriminatory hostile work environment claim), the plaintiff must demonstrate (1) protected EEO activity and (2) "a causal connection between the harassment [he] suffered and [his] involvement in protected EEO activity" to establish a retaliatory hostile work environment claim. *Na'im v. Clinton*, 626 F. Supp. 2d 63, 79, 81 (D.D.C. 2009); *see also Nichols v. Truscott*, 424 F. Supp. 2d 124, 140–41 (D.D.C. 2006) (requiring the plaintiff to show both (1) that "she engaged in statutorily protected activity" and (2) "a causal connection between the harassment in question and her protected activity").

### a. Severe or Pervasive Harassment

Because both theories of relief require the plaintiff to establish that his work environment was truly "hostile," the Court begins by examining that element of each theory of relief. To meet the hostility threshold, the Court must look at the totality of circumstances and examine whether the harassment "unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. "[C]onduct must be extreme to amount to a change in the terms and conditions of employment . . . ." *Faragher*, 524 U.S. at 788. "[C]asual or isolated manifestations of a discriminatory [or retaliatory] environment . . . may not raise a cause of action." *Park v. Howard Univ.*, 71 F.3d 904, 906 (D.C. Cir. 1995) (quoting *Bundy v. Jackson*, 641 F.2d 934, 943 n.9 (D.C. Cir. 1981)). Further, not all forms of workplace harassment are prohibited, only harassment

based on a person's membership in a protected class or his protected Title VII activity.  *See, e.g.*, *Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C. Cir. 2002); *Na'im*, 626 F. Supp. 2d at 81.

Here, the evidence on record creates at least a question of fact about whether Dr. Coulibaly experienced such severe and pervasive harassment that it affected the terms and conditions of his employment.  Communications in 2011 and 2012 between Dr. Coulibaly and his supervisors show that his supervisors regularly scrutinized his work, as if seeking to find fault with it.  Between August and December 2011, LTS Fyfe (Dr. Coulibaly's supervisor at the time) repeatedly asked Dr. Coulibaly to produce his lesson plans and class materials for her review.[40] When Dr. Coulibaly would provide responses to her requests, LTS Fyfe frequently found those responses unsatisfactory and would ask him to take further action,[41] even though she later

---

[40] The Court summarizes the relevant timeline here:

1. LTS Fyfe requested class readings from Dr. Coulibaly on August 12, 2012.  *See* Email from Laura Fyfe (Nov. 7, 2011), EEO Investigation Report at 7213, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-7.

2. She asked Dr. Coulibaly to prepare a reading lesson plan on August 19, 2011.  *See* Email from Laura Fyfe to Tiemoko Coulibaly (Aug. 19, 2011), EEO Investigation Report at 733, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-7.

3. She asked Dr. Coulibaly to improve his reading lesson plan on August 30, 2011.  *See* Email from Laura Fyfe (Nov. 7, 2011), EEO Investigation Report at 722.

4. She again requested a reading lesson plan on October 3, 2011.  *See id.*, EEO Investigation Report at 723.

5. She contacted Dr. Coulibaly again about his reading lesson plan on November 4, 2011.  *See* Email from Laura Fyfe to Tiemoko Coulibaly (Nov. 4, 2011), EEO Investigation Report at 731, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-7.

6. And she asserted at a December 14, 2011 meeting that Dr. Coulibaly had not submitted required weekly syllabi for a period of three weeks.  *See* Email from Debra Blake (Dec. 15, 2011), EEO Investigation Report at 786–87, ECF No. 36-4.

[41] *See, e.g.*, Email from Laura Fyfe (Nov. 7, 2011), EEO Investigation Report at 722–23 (characterizing Dr. Coulibaly's lesson plan as "a template for writing a lesson plan—not an

admitted that her recommended lesson plan method ("the four Ps") was not always an

appropriate approach.[42] And when LTS Casteuble became Dr. Coulibaly's supervisor in 2012, he

likewise reviewed Dr. Coulibaly's class syllabi and found the syllabi wanting on multiple

occasions.[43]

Dr. Coulibaly's supervisors' scrutiny only continued when Dr. Coulibaly took a leave of

absence to attend to his medical issues, beginning on February 15, 2012.  *See* Defs.' Facts.

Ex. Q, at 1315, 1317, ECF No. 30-17 (showing that Dr. Coulibaly took a combination of sick

---

actual lesson plan" and seeking improvements from Dr. Coulibaly); Email from Laura Fyfe to
Tiemoko Coulibaly (Oct. 5, 2011), EEO Investigation Report at 732, *Coulibaly v. Kerry*,
No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-7 (confirming LTS Fyfe's disapproval of
Dr. Coulibaly's lesson plan); PAR Report by Laura Fyfe, EEO Investigation Report at 790, ECF
No. 36-4 (discussing Dr. Coulibaly's lesson plans and weekly syllabi as issues with
Dr. Coulibaly's performance).

[42] *See* Email from Ann Keller-Lally (Nov. 9, 2011), EEO Investigation Report at 754–56,
ECF No. 36-3 (noting that, in a November 8, 2011 meeting, LTS Fyfe admitted that
Dr. Coulibaly was "rightly confused" about LTS Fyfe's directive to use the "four P's" method).

[43] The Court summaries the timeline with respect to LTS Casteuble here:

1. LTS Casteuble reviewed Dr. Coulibaly's syllabus and asked several questions
   about it on January 24, 2012.  *See* Email from Philippe Casteuble to Tiemoko
   Coulibaly (Jan. 24, 2012), EEO Investigation Report at 829–30, ECF No. 36-4.

2. LTS Casteuble asked to talk with Dr. Coulibaly about his weekly syllabus again
   on February 2, 2012.  *See* Email from Philippe Casteuble to Tiemoko Coulibaly
   (Feb. 2, 2012), EEO Investigation Report at 820, ECF No. 36-4.

3. On February 6, 2012, LTS Casteuble reminded Dr. Coulibaly about the earlier
   questions that LTS Casteuble had asked about the syllabus.  *See* Email from
   Philippe Casteuble to Tiemoko Coulibaly (Feb. 6, 2012, 8:29 AM), EEO
   Investigation Report at 829, ECF No. 36-4.

4. On February 10, 2012, Dr. Coulibaly received a counseling memorandum from
   LTS Casteuble that again criticized Dr. Coulibaly's syllabi.  *See* Casteuble Mem.
   (Feb. 10, 2012), Defs.' Facts Ex. P, ECF No. 30-16.  When Dr. Coulibaly
   responded to LTS Casteuble's questions about the syllabi, LTS Casteuble found
   his response unsatisfactory as well.  *See* Email from Philippe Casteuble (Feb. 13,
   2012, 8:13 AM), EEO Investigation Report at 895, ECF No. 36-4 ("I see a
   laundry list of activities but I still don't see how they reinforce each other or how
   they are linked with his teaching objectives.").

leave, annual leave, and leave without pay for six weeks).  During that time, instead of criticizing

his work, his supervisors turned their attention to his leave requests.  The record shows repeated

questioning directed toward Dr. Coulibaly about his leave requests, combined with notifications

that Dr. Coulibaly was running out of the leave available to him.[44]  The record also shows that

LTS Casteuble at one point submitted an incomplete leave request on Dr. Coulibaly's behalf, but

---

[44] The Court again recounts the relevant timeline:

1. On March 1, 2012, Director Blake informed Dr. Coulibaly of his remaining allowance of sick leave and annual leave.  *See* Email from Debra Blake (Mar. 1, 2012), EEO Report of Investigation at 892, ECF No. 36-4.

2. On March 2, 2012, FSI Human Resources Specialist Brian Springer wrote to Dr. Coulibaly to explain the procedures for requesting advanced sick leave, the only type of sick leave available if Dr. Coulibaly were to exhaust his remaining sick leave hours.  *See* Email from Brian Springer (Mar. 2, 2012), EEO Report of Investigation at 890–91, ECF No. 36-4; *see also* Springer Aff., EEO Report of Investigation at 971, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-9 (noting HR Specialist Springer's position title at FSI).

3. On March 5, 2012, LTS Casteuble contacted Dr. Coulibaly to see whether Dr. Coulibaly knew when he planned to return to work and to clarify what type of leave Dr. Coulibaly intended to use while he was absent.  *See* Email from Philippe Casteuble to Tiemoko Coulibaly (Mar. 5, 2012), EEO Report of Investigation at 887, ECF No. 36-4.

4. On March 6, 2012, LTS Casteuble wrote to Dr. Coulibaly to inform him that he had run "completely out of sick leave" on February 23, 2012, and that he had only "68 hours of annual leave remaining" on February 24, 2012, which would cover Dr. Coulibaly only through March 7, 2012.  *See* Email from Philippe Casteuble to Tiemoko Coulibaly (Mar. 6, 2012), EEO Report of Investigation at 885, ECF No. 36-4.

5. On March 7, 2012, HR Specialist Springer told Dr. Coulibaly that, if Dr. Coulibaly did not provide a leave type for his ongoing absence, he would be considered absent without official leave.  *See* Email from Brian Springer (Mar. 7, 2012), EEO Report of Investigation at 882, ECF No. 26-8.

6. On Friday, March 9, 2012, HR Specialist Springer told Dr. Coulibaly that, because he had not yet submitted a request for advanced leave, he was scheduled to come to work on Monday, March 12, 2012.  *See* Email from Brian Springer to Tiemoko Coulibaly (Mar. 9, 2012), EEO Report of Investigation at 874, ECF No. 36-4.

against Dr. Coulibaly's wishes—which may have led to the later accusation that Dr. Coulibaly had "fail[ed] to follow established procedures for requesting leave."[45]

Dr. Coulibaly's former colleagues corroborate the idea that Dr. Coulibaly's supervisors imposed exceptional scrutiny on his performance.[46]  Given the frequency and extent of Dr. Coulibaly's supervisors' criticisms with respect to both his work and his leave requests, and the alleged significant impact this scrutiny had on his health, the record raises sufficient questions to merit further exploration in discovery.  *See Faragher*, 524 U.S. at 786–88.  On this record, it would be premature to grant summary judgment on Dr. Coulibaly's hostile work environment claim because of a failure to demonstrate severe or pervasive harassment.  *Contra* Defs.' Mem. 17–23.  The Court accordingly examines, briefly, whether the evidence on record allows Dr. Coulibaly to make the other preliminary showings required to establish either discriminatory hostile work environment or retaliatory hostile work environment.

---

[45] *See* Defs.' Facts Ex. I, ECF No. 30-9 (citing Dr. Coulibaly's "failure to follow established procedures for requesting leave" as cause for his termination).  *But see* Email from Tiemoko Coulibaly to Philippe Casteuble (Mar. 29, 2012), EEO Investigation Report at 867–68, ECF No. 36-4 ("I answered by email to you [and said] that I will submit . . . the request [again] on Friday with the appropriate memo and information. So I don't understand why you presented this incomplete request to HR.").

[46] *See* Cazeau Aff. ¶ Q4, EEO Report of Investigation at 1339, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-12 ("He was clearly the target of his supervisor."); Duran Aff. ¶ Q4.c, EEO Report of Investigation at 1344, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-12 ("They gave unfounded reasons [for Dr. Coulibaly's termination]."); Smith Aff. ¶ Q4.c, EEO Report of Investigation at 1364–65, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-12 ("[I]t [was] evident that [Dr. Coulibaly's supervisors were] looking for reasons to not tenure him so that they can fire him."); De Launay-Fogg Aff. ¶¶ Q5–Q6, EEO Report of Investigation at 1375, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-12 (observing that Mr. Hmimiche was "treated very differently" from Dr. Coulibaly).

### b. Discriminatory Hostile Work Environment

Combined with the evidence discussed above, Dr. Coulibaly presents sufficient evidence to support a prima facie case for discriminatory hostile work environment. As noted earlier, Dr. Coulibaly can establish a prima facie case of discriminatory hostile work environment by showing (1) that he is a member of a protected class; (2) that he was subject to unwelcome harassment; (3) that the harassment was because of the plaintiff's protected status; (4) that the harassment affected a term, condition, or privilege of employment; and (5) that his employer knew or should have known of the harassment and failed to take action to prevent it. *Lester v. Natsios*, 290 F. Supp. 2d 11, 22 (D.D.C. 2003). Dr. Coulibaly can make preliminary showings for each of the five elements.

First, as someone from the Ivory Coast, *see* Compl. ¶ 19, he can assert a protected class based on his national origin. Second, as discussed above, evidence in the record indicates that Dr. Coulibaly was subject to unwelcome harassment through his supervisors' scrutiny of his work and leave requests. *See supra* Part III.C.7.b. Third, some evidence supports Dr. Coulibaly's assertion that, because LTS Fyfe's ex-husband was Ivorian like Dr. Coulibaly, she engaged in some of these hostilities because of Dr. Coulibaly's national origin. *See* Email from Tiemoko Coulibaly (Nov. 15, 2011), EEO Investigation Report at 744, ECF No. 36-3 (noting that during a meeting, LTS Fyfe had accused Dr. Coulibaly of "'discrimination' 'against' *her* because of her 'background' and because her 'former husband' was 'Ivorian' (like [Dr. Coulibaly])" (emphasis added)); Email from Laura Fyfe to Debra Blake (Nov. 15, 2011), EEO Investigation Report at 743, ECF No. 36-3 (admitting that LTS Fyfe "did ask [Dr. Coulibaly] if he had an ax to grind against [her] because of [her] ex"). Fourth, as discussed above, Dr. Coulibaly facially shows that the alleged harassment was so severe that it affected the

conditions of his employment.  *See supra* Part III.C.7.a.  Finally, the record indicates that FSI knew or should have known about the hostile work environment, because Dr. Coulibaly made several attempts to alert FSI management to his situation—not least of which was his EEO complaint in early 2012 that alleged that "[he was] subjected to a hostile work environment characterized by, but not limited to, false accusations and inappropriate comments."  *See* Letter from Jenniffer J. De Heer to Tiemoko Coulibaly (Jan. 17, 2012), EEO Investigation Report at 185, ECF No. 36-3 (accepting Dr. Coulibaly's hostile work environment allegation for investigation).  Although this evidence is not overwhelming, it is sufficient to allow Plaintiff to proceed to discovery.

On this record, it would be inappropriate to enter summary judgment for Defendants on any discriminatory hostile work environment claim alleged in Count 6 of Dr. Coulibaly's complaint.  The Court therefore denies Defendants' motion for summary judgment on that claim, to allow the parties to explore it in discovery.

### c. Retaliatory Hostile Work Environment

The evidence on record also contains the preliminary showings necessary to allow Dr. Coulibaly to litigate a retaliatory hostile work environment claim.  To prevail on that claim, Dr. Coulibaly must establish not just severe or pervasive harassment, but also (1) protected EEO activity and (2) "a causal connection between the harassment [he] suffered and [his] involvement in protected EEO activity."  *Na'im v. Clinton*, 626 F. Supp. 2d 63, 79, 81 (D.D.C. 2009).  For both additional elements, sufficient evidence exists to raise issues for the parties to explore in discovery.

As for his retaliation claim based on his eventual termination, Dr. Coulibaly can establish protected EEO activity by reference to his informal discrimination complaint, filed with the

Department of State in November 2011.  *See* Compl. ¶ 95 (stating that Dr. Coulibaly filed an informal EEO complaint on November 23, 2011).  And at least one of his former colleagues corroborates his view that his EEO complaint prompted his supervisors' harassment.  *See* De Launay-Fogg Aff. ¶¶ Q5–Q6, EEO Report of Investigation at 1375, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-12 (noting how, "[a]fter Dr. Coulibaly started his EEO complaint, management fell on him"); *see, e.g.*, Email from Tiemoko Coulibaly (Dec. 27, 2011), EEO Investigation Report at 788–89, ECF No. 36-4 (alleging that Dr. Coulibaly's December 2011 performance appraisal report was "evidence of retaliation" and that Director Blake and LTS Fyfe could not "separate performance evaluation from discrimination and retaliation against" Dr. Coulibaly).  Moreover, Defendant's statements that his complaints of discrimination may amount to insubordination also evidences potential hostility to protected activities.  The record thus presents genuine issues with respect to a retaliatory hostile work environment claim.  The Court accordingly also denies summary judgment on Count 6, to the extent that it alleges a retaliatory hostile work environment, so that the parties may explore that claim in discovery.

*     *     *

In sum, the Court will grant Defendants' motion with respect to Counts 1, 2, 3, 4, 6, 13, 14, 15, 16, and 20, to the extent that they allege Title VII violations, with the exception of Counts 6, 13, and 16 as asserted against Secretary Kerry. The Court will deny the motion with respect to Count 6, which alleges hostile work environment, *see* Compl. ¶¶ 106–07; Count 13, which alleges wrongful discharge, *see id.* ¶¶ 127–29; and Count 16, which seeks review of Dr. Coulibaly's retaliation claims relating to 2009 events, *see id.* ¶ 161.

## D.  Rehabilitation Act

The Court next addresses Dr. Coulibaly's claim, asserted in Count 18 of his complaint, which alleges that FSI denied his request for a reasonable accommodation.  *See* Compl. ¶¶ 177–83.  Because Defendants' arguments about Count 18 rely on evidence aside from Dr. Coulibaly's complaint, *see* Defs.' Mem. at 23–26, the Court applies the legal standard for motions for summary judgment under Rule 56.  *See supra* Part III.C.1 (describing that legal standard).[47]

In Count 18 of his complaint, Dr. Coulibaly asserts that the Department of State failed to grant his request for a reasonable accommodation in the form of a change in supervisor.  *See* Compl. ¶¶ 177–83.  Although the language in Dr. Coulibaly's complaint is unclear, Defendants surmise that his reasonable accommodation claim falls under the Rehabilitation Act.  *See* Defs.' Mem at 24 & n.14.  Because "[t]he Rehabilitation Act of 1973 governs employee claims of handicap discrimination against the Federal Government," the Court agrees.  *Barth v. Gelb*, 2 F.3d 1180, 1183 (D.C. Cir. 1993); *cf. Klute v. Shinseki*, 797 F. Supp. 2d 12, 17 ("[T]he

---

[47] Although it is improper to convert a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction into a motion for summary judgment, *see Ord v. Dist. of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009), Defendants' arguments about Count 18 do not assert that this Court lacks jurisdiction over the claim.  Defendants instead merely assert that Dr. Coulibaly's "failure to accommodate claim was not properly exhausted."  Defs.' Mem. at 25. And though the Court may lack jurisdiction to decide Rehabilitation Act claims for which the plaintiff has not filed or obtained a final disposition on an administrative complaint, *see Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir. 2006), the D.C. Circuit has expressly held that "the deadline for contacting an EEO counselor [under the Rehabilitation Act] is not jurisdictional." *Doak v. Johnson*, 798 F.3d 1096, 1104 (D.C. Cir. 2015).  Here, the record indicates that Dr. Coulibaly has filed an administrative complaint with respect to his disability discrimination claim, which the Department of State later dismissed because Dr. Coulibaly did not bring his claims to the attention of an EEO counselor within the forty-five-day time limit.  *See* Pl.'s Resp. Ex., at 56–60, ECF No. 36-2 (reproducing the dismissal letter).  Because Dr. Coulibaly has filed an administrative complaint and has obtained a final disposition on it, the Court has jurisdiction to adjudicate the disability discrimination claim now.  Defendants' exhaustion argument accordingly is not one raised on jurisdictional grounds.

[Americans with Disabilities Act] does not apply to employees of the federal government . . . ." (citing 42 U.S.C. § 12111(5)(B)(i))).

Defendants argue that Dr. Coulibaly has failed to exhaust administrative remedies with respect to his claim that FSI denied him a reasonable accommodation. *See* Defs.' Mem. at 23–25. Their argument relies on a valid legal premise: a plaintiff may file a Rehabilitation Act claim in federal court only after he exhausts his administrative remedies. *See Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir. 2006) (citing 29 U.S.C. § 794a(a)(1)). As is the case for Title VII claims, plaintiffs must exhaust administrative remedies for their Rehabilitation Act claims by bringing them to the attention of an EEO counselor within forty-five days of the alleged discriminatory action. *See* 29 C.F.R. § 1614.105(a) ("Aggrieved persons who believe they have been discriminated against on the basis of . . . disability . . . must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory . . . ."); *accord Lenkiewicz v. Castro*, 146 F. Supp. 3d 99, 108 (D.C. Cir. 2007).

But Defendants are incorrect when they argue that, before filing his third amended complaint, Dr. Coulibaly never claimed any form of discrimination on the basis of disability. Defs.' Mem. at 24–25. To the contrary, Dr. Coulibaly has produced evidence showing that he filed a formal administrative complaint with the Department of State that alleged disability discrimination. *See* Pl.'s Resp. Ex., at 56, ECF No. 36-2. The Department dismissed the administrative complaint on October 13, 2015. *See id.* at 56–60 (reproducing the dismissal letter). The Court therefore cannot dismiss Dr. Coulibaly's Rehabilitation Act claim because he *never* sought administrative relief.

The Court can, however, consider whether Dr. Coulibaly timely brought his Rehabilitation Act claim to an EEO counselor's attention, which is a necessary part of

exhausting his administrative remedies.  *See Lenkiewicz*, 146 F. Supp. 3d at 108; *Faison v. Vance-Cooks*, 896 F. Supp. 2d 37, 51 (D.D.C. 2012).  The evidence on record indicates that Dr. Coulibaly did not contact an EEO counselor about his disability discrimination claim "until April 16, 2015, which is three years after the termination of [his] employment with the Department."  Pl.'s Resp. Ex., at 57, ECF No. 36-2 (reproducing the Department's dismissal letter).  As the Department's dismissal letter points out, "this far exceeds the 45-day period for timely contacting an EEO Counselor."  *Id.*  Because the forty-five-day time limit functions like a statute of limitations, *see Doak v. Johnson*, 798 F.3d 1096, 1104 (D.C. Cir. 2015), the Court must dismiss Dr. Coulibaly's Rehabilitation Act claim for his lack of timeliness in bringing it to the Department's attention.  *Accord Perry v. U.S. Dep't of State*, 669 F. Supp. 2d 60, 65–67.

To be sure, Dr. Coulibaly could escape the forty-five-day limit if he showed (1) "that he . . . was not notified of the time limits and was not otherwise aware of them," (2) that he "did not know and reasonably should not have . . . known" that the disability discrimination had occurred, or (3) that "despite due diligence he . . . was prevented by circumstances beyond his . . . control from contacting the counselor within the time limits."  *See* 29 C.F.R. § 1614.105(a)(2).  But, for his disability discrimination claim at least, Dr. Coulibaly cannot contend that he "was not notified of the time limits and was not otherwise aware of them."  *Id.* This is because, previously, in relation to another of his EEO complaints, Dr. Coulibaly received a letter that informed him of the forty-five-day time limit for contacting an EEO counselor.  *See* Defs.' Facts Ex. II, at 6–7, ECF No. 30-35.  He received that information in January 2012, far in advance of when he eventually made contact with an EEO counselor about his disability discrimination claim in 2015.  *See id.* at 2 (showing that the letter about the forty-five-day time limit was dated January 17, 2012).  And by submitting other claims of discrimination in a timely

fashion during this same time period, he cannot persuasively argue ignorance of the time requirements.

Dr. Coulibaly has not argued either (1) that he "did not know and reasonably should not have . . . known" that disability discrimination occurred or (2) that "despite due diligence he . . . was prevented by circumstances beyond his . . . control from contacting the counselor within the time limits." 29 C.F.R. § 1614.105(a)(2); *see* Pl.'s Resp. ¶¶ 495–503, ECF No. 36-1. The Court therefore has no reason to excuse Dr. Coulibaly's failure to timely bring his disability discrimination claim to an EEO counselor's attention. Accordingly, the Court will dismiss Dr. Coulibaly's reasonable accommodation claim, asserted in Count 18 of his complaint, without reaching its merits.

### E.  First Amendment

The Court next considers Dr. Coulibaly's First Amendment claims, which he asserts in two counts of his complaint:

> (1) Count 5, which alleges reprisal and retaliation in "violation of Title VII . . . as well [as] the First Amendment" based on Dr. Coulibaly's "political activities related to his country of origin," Compl. ¶¶ 104–05; and
>
> (2) The second of the two counts labeled "Count 19" in Dr. Coulibaly's complaint, which alleges that Defendants violated Dr. Coulibaly's First Amendment rights by preventing him from speaking about systemic discrimination on December 29, 2011, *id.* ¶¶ 193–96.

The parties cite to evidence outside the complaint when discussing these claims. *See* Defs.' Mem. at 41–45; *see, e.g.*, Pl.'s Resp. ¶ 89 (discussing the EEO Report of Investigation in the context of Dr. Coulibaly's retaliation claims, as well as his other claims). The Court accordingly

applies the legal standard applicable to motions for summary judgment under Rule 56.  *See supra*

Part III.C.1 (describing that legal standard).  The Court discusses each First Amendment claim in

turn.

### 1.  2007 Speech

Given that it appears alongside claims made with respect to FSI's failure to hire

Dr. Coulibaly in 2007, the Court construes Count 5 of Dr. Coulibaly's complaint as alleging that

FSI did not hire him in 2007 because of his protected First Amendment speech—namely,

communicating with the media about the Ivorian government.  *See* Compl. ¶¶ 97–105.  The

Court analyzes this claim first as asserted against the United States, and then as asserted against

the individual defendants.

### a.  Claims Against the United States

To the extent that Dr. Coulibaly seeks damages against the federal government for

alleged First Amendment violations, *see, e.g.*, Compl. ¶ 196 (requesting "appropriate damages"),

his First Amendment claims cannot proceed.  "Federal constitutional claims for damages are

cognizable only under *Bivens* [*v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403

U.S. 388 (1971)], which runs against individual government officials personally."  *Loumiet v.*

*United States*, 828 F.3d 935, 945 (2016) (citing *FDIC v. Meyer*, 510 U.S. 471, 482, 485–86

(1994)).  For that reason, "the United States is not a proper *Bivens* defendant," *Stebbins v. United*

*States*, 554 F. App'x 14, 14 (D.C. Cir. 2014) (per curiam), and Dr. Coulibaly cannot pursue a

claim for damages under the First Amendment against the United States.  *See FDIC v. Meyer*,

510 U.S. 471, 477 (1994) (finding no waiver of sovereign immunity for damages claims for

constitutional torts).

And, to the extent that Dr. Coulibaly's First Amendment claim based on 2007 events seeks equitable or injunctive relief, that claim is moot, given that the Department of State eventually hired him (notwithstanding his protected First Amendment speech) in 2011.  *See* Notification of Personnel Action, Defs.' Facts Ex. C, ECF No. 30-3 (showing that Dr. Coulibaly began working as a Department of State employee on June 19, 2011).  The doctrine of mootness derives from the principle that "the courts of the United States, pursuant to Article III of the Constitution, have no jurisdiction to act unless there is 'a case or controversy.'"  *True the Vote, Inc. v. IRS*, No. 14-5316, 2016 WL 4151231, at *5 (D.C. Cir. Aug. 5, 2016).  *See generally* U.S. Const. art. III, § 2 (extending the federal courts' jurisdiction to specific types of "cases" and "controversies").  When a plaintiff seeks equitable or injunctive relief but "there remains no conduct to be enjoined," then "normally there is no relief that need be granted, the case or controversy has ceased, and the jurisdiction of the court has expired under Article III."  *True the Vote*, 2016 WL 4151231, at *7.  Put another way, when "events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future," the federal court must refrain from deciding whether to grant injunctive relief.  *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc) (internal quotation marks omitted) (quoting *Transwestern Pipeline Co. v. FERC*, 897 F.2d 570, 575 (D.C. Cir. 1990)).

That is the case here.  Even if the Court were to decide that the federal government violated Dr. Coulibaly's First Amendment rights in 2007, that decision would not "presently affect" Dr. Coulibaly's rights, for purposes of equitable relief.  *Clarke*, 915 F.2d at 701 (quoting *Transwestern Pipeline Co.*, 897 F.2d at 575).  Dr. Coulibaly alleges that, because of the Department of State's First Amendment retaliation, he suffered harm when he was not hired or

promoted in 2007.  *See* Compl. ¶¶ 83–105.  Assuming that to be true, the corresponding

equitable relief for his alleged First Amendment violation would be an order requiring the

Department of State to hire Dr. Coulibaly.  Because the Department of State has already done so,

*see* Notification of Personnel Action, Defs.' Facts Ex. C, ECF No. 30-3, there is "no relief that

need be granted" in relation to the First Amendment claim relating to 2007 events, *True the Vote*,

2016 WL 4151231, at *7.  Any action for equitable or injunctive relief based on those events is

therefore moot, and the Court lacks jurisdiction to act on it.[48]  *See id.*

Because Dr. Coulibaly cannot press a First Amendment claim, based on 2007 events, for

either damages or injunctive relief against the United States, the Court will dismiss Count 5 of

Dr. Coulibaly's complaint, as asserted against the United States.  The Court now discusses

Count 5, as asserted against the individual defendants.

### b.  Claims Against Individual Defendants

Even though Dr. Coulibaly may not bring a First Amendment claim for damages against

the United States, he may sue the individual defendants in their personal capacities for damages

under *Bivens*.  *See Loumiet*, 828 F.3d at 945 (citing *Meyer*, 510 U.S. at 482, 485–86); *see also*

*Richardson v. Yellen*, No. 14-1673, 2016 WL 890570, at *7 n.9 (D.D.C. Mar. 8, 2016) ("Under

*Bivens* . . . , plaintiffs can allege constitutional torts directly against individual federal

employees.").  But, as discussed earlier in this opinion, proper service has not yet been effected

on the individual defendants in their personal capacities.  *See supra* Part III.B.3.a.  Before the

individual defendants are served with process and before they receive an opportunity to respond

to the allegations made against them, the Court need not address the merits of Dr. Coulibaly's

---

[48] The fact that the State Department later terminated him in 2012 does not change the
fact that the alleged harm suffered in 2007 was remedied when he was hired in 2011.  The
propriety of the termination in 2012 is the subject of Plaintiff's other claims.

First Amendment claim based on 2007 events.[49]  The Court will therefore deny Defendants'

motion with respect to this claim, as asserted against the individual defendants, without

prejudice.

Given that Dr. Coulibaly is *in forma pauperis*, the Court will order the United States

Marshal to serve the individual defendants so that the Court may eventually address the merits of

this claim.  *See* Fed. R. Civ. P. 4(c)(3) (stating that the court must order "a United States marshal

or deputy marshal or . . . a person specially appointed by the court" to effect service of process

when the plaintiff is authorized to proceed in forma pauperis).  Because the defendants are sued

in their personal capacities, the Court will order the United States Marshal to serve the individual

defendants personally.  *See* Fed. R. Civ. P. 4(e)(2)(A).  If the United States Marshal is unable to

do so, the Court will order Dr. Coulibaly to provide addresses for the individual defendants'

dwellings, so that the United States Marshal may effect service through another means.  *See* Fed.

R. Civ. P. 4(e)(2)(B) (allowing service at a defendant's "dwelling or usual place of abode"); *see

also* Fed. R. Civ. P. 4(e)(1) (allowing service by means allowed under state law "in the state

where the district court is located or where service is made"); D.C. Super. Ct. R. Civ. P. 4(c)(3),

(4) (allowing service by mail to a defendant's residence).[50]

### 2.  2011 Speech

The Court now turns to the second of Dr. Coulibaly's First Amendment claims.  In the

second of the two counts labeled "Count 19" in Dr. Coulibaly's complaint, Dr. Coulibaly alleges

---

[49] It appears that the statute of limitations may have already run on these claims.  *See
generally Banks v. Chesapeake & Potomac Tel. Co.*, 802 F.2d 1416, 1429 (D.C. Cir. 1986)
("[T]he three-year limitations period in [D.C. Code] § 301(8) applies . . . to most *Bivens*
actions . . . ."); *Richardson*, 2016 WL 890570, at *7 (explaining that, in the District of Columbia,
three years is the longest period that could apply to a plaintiff's *Bivens* claims).

[50] Of course, the individual defendants may choose to waive service or designate their
counsel to accept service on their behalf.

that his First Amendment rights were violated when LTS Casteuble issued him a reprimand letter about his statements at the French language section meeting on December 29, 2011. *See* Compl. ¶¶ 193−96. *See generally supra* Part II.A.7 (discussing the meeting). Defendants challenge Dr. Coulibaly's claim by asserting that his speech during the meeting was not protected speech under the First Amendment (1) because it did not address "systematic or global discrimination" and (2) because Dr. Coulibaly spoke in the context of performing his official employment duties, and not as a citizen. Defs.' Mem. at 42–44. The Court agrees with both of these assertions.

Although "public employees do not surrender all their First Amendment rights by reason of their employment," *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006), a public employee's speech receives First Amendment protection only when the employee speaks "as a citizen on a matter of public concern," *Bowie v. Maddox*, 642 F.3d 1122, 1133 (D.C. Cir. 2011) (quoting *Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007). *See generally Garcetti*, 547 U.S. at 417 ("[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."). Logically, to speak "as a citizen on a matter of public concern," the public employee must satisfy two prerequisites: he must not only speak "on a matter of public concern," but he also speak "as a citizen." *See Bowie*, 642 F.3d at 1133–34 (internal quotation marks omitted) (quoting *Wilburn*, 480 F.3d at 1149).

Speech about personal disputes between employees and supervisors generally does not address matters of public concern. *See Connick v. Myers*, 461 U.S. 138, 148 (1983) (holding that speech about an employee's displeasure in being transferred does not address a matter of public concern). To be sure, "morale in the workplace [is] related to an agency's efficient performance of its duties" and, in that way, it can address a matter of public concern. *Id.* Nonetheless, an employee's speech about morale in the workplace does *not* address a matter of public concern

when the speech merely seeks "to gather ammunition for another round of controversy with . . . superiors." *Id.* Likewise, speech does not address a matter of public concern when it deals with "individual personnel disputes and grievances." *Murray v. Gardner*, 741 F.2d 434, 438 (D.C. Cir. 1984) (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir.1983)). Speech is not protected when it is "of pressing import only to other employees in the speaker's office, *Barnes v. Small*, 840 F.2d 972, 982 (D.C. Cir. 1988), and "would be of no relevance to the public's evaluation of the performance of government agencies," *Murray*, 741 F.2d at 438 (quoting *McKinley*, 705 F.2d at 1114).

Here, individuals who were present at the meeting—including a colleague sympathetic to Dr. Coulibaly, in addition to a member of FSI's management—attest that Dr. Coulibaly's speech focused on personal experiences of discrimination. *See* Casteuble Mem. (Jan. 24, 2012), EEO Investigation Report at 815, ECF No. 36-4 (stating that Dr. Coulibaly spoke about "discrimination and retaliation against [him] on the part of the French [s]upervisors"); Cazeau Aff., EEO Investigation Report at 1340, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-12 (stating that, at the meeting, "Dr. Coulibaly started saying that he felt discriminated against because of his lesson plan"). And though Dr. Coulibaly asserts that his speech opposed "systemic and global discrimination," Compl. ¶¶ 194–95, he provides no facts or argument to support the idea that his speech dealt with matters of public concern. *See* Pl.'s Resp. ¶¶ 515–17. Thus, no evidence shows that his speech extended beyond an individual personnel dispute. At most, the evidence reflects Dr. Coulibaly's attempt to turn his own dispute with FSI management "into a cause celèbre." *Connick*, 461 U.S. at 148; *cf. Tao v. Freeh*, 27 F.3d 635, 640 (D.C. Cir. 1994) (holding that a claim implicated matters of public concern and was

"broader than an individual employee personnel grievance" when it involved a "protest" against discrimination allegedly occurring against *all* Chinese-Americans in the employee's unit).

Dr. Coulibaly's speech does not merit First Amendment protection for another reason: he was not speaking as a citizen during the December 29, 2011 meeting; his speech instead "owe[d] its existence to . . . his professional responsibilities" as a public employee. *Garcetti*, 547 U.S. at 421–22. The D.C. Circuit has "consistently held that a public employee speaks without First Amendment protection when he reports conduct that interferes with his job responsibilities, even if the report is made outside his chain of command." *Mpoy v. Rhee*, 748 F.3d 285, 290–91 (D.C. Cir. 2014) (internal quotation mark omitted) (quoting *Winder v. Erste*, 566 F.3d 209, 215 (D.C. Cir. 2009). And, even more relevantly, the D.C. Circuit has held that speech alleging discrimination with respect to certain employees' salaries was not protected speech, because that speech fell within the speaking employee's job responsibilities. *See Wilburn*, 480 F.3d at 1150–51.

Dr. Coulibaly's speech about FSI discrimination and retaliation, Compl. ¶ 194, falls squarely in the category of speech that, under these precedents, is not protected. Dr. Coulibaly spoke about how FSI's discrimination manifested through the lesson plan requirement that FSI imposed on him. *See* Cazeau Aff., EEO Investigation Report at 1339–40, *Coulibaly v. Kerry*, No. 14-0712 (D.D.C. Mar. 4, 2016), ECF No. 26-12. That speech "reports conduct that interferes with his job responsibilities," *Mpoy*, 758 F.3d at 291, "owes its existence" to his professional responsibilities as a public employee, *Garcetti*, 547 U.S. at 421–22, and accordingly lacks First Amendment protection, *see Mpoy*, 758 F.2d at 290–91.

Thus, because Dr. Coulibaly can show neither that he spoke "on a matter of public concern" nor that he spoke "as a citizen," he does not meet a threshold requirement for a First

Amendment retaliation claim based on his December 29, 2011 speech.  *See Bowie*, 642 F.3d at

1133 (explaining that, to establish the first element of a First Amendment retaliation claim, the

public employee must establish that he "spoke[] as a citizen on a matter of public concern"

(quoting *Wilburn*, 480 F.3d at 1149)).  The Court therefore grants Defendants' motion for

summary judgment on the second of the two counts labeled "Count 19" in the complaint.

### F.  Claims Under District of Columbia Law

Having determined that Dr. Coulibaly's First Amendment claims cannot proceed, the

Court turns to Counts 12 and 17 of Dr. Coulibaly's complaint, in which he brings claims under

two District of Columbia statutes: the District of Columbia Workplace Fraud Act, and the

District of Columbia Whistleblower Protection Act.[51]  *See* Compl. ¶¶ 118–26, 165–76.  Because

the parties cite to evidence beyond the complaint when addressing these claims, *see* Defs.' Mem.

29–32; *see, e.g.*, Pl.'s Resp. ¶ 485, the Court applies the legal standard for motions for summary

judgment under Rule 56.  *See supra* Part III.C.1 (describing that legal standard).  The Court

addresses each count in turn.

---

[51] Although the issue need not be resolved here, the Court is skeptical to the idea that the United States has waived sovereign immunity for District of Columbia local workplace laws. Courts have found sovereign immunity for claims against federal agencies arising under the District of Columbia Human Rights Act, because there is "no evidence in any federal statute that Congress intended to allow the federal government to be sued for discrimination" under the Act. *See Jordan v. Evans*, 404 F. Supp. 2d 28, 31 (D.D.C. 2005); *see also Marcus v. Geithner*, 813 F. Supp. 2d 11, 17 (D.D.C. 2011).  Here, Plaintiffs' claims arise under laws enacted by the District of Columbia Council, not federal statutes.  *See* Workplace Fraud Amendment Act of 2012, B19-0169, 2013 Council, 20th Period (D.C. 2013) (codified at D.C. Code §§ 32-1331.01–1331.15); Whistleblower Reinforcement Act of 1998, B12-0191, 1997 Council, 12th Period (D.C. 1997) (codified at D.C. Code §§ 1-615.51–615.59).  Accordingly, there is no evidence in a federal statute that Congress intended to waive sovereign immunity.

1. Workplace Fraud Act

In Count 12 of his complaint, Dr. Coulibaly argues that the Department of State misclassified him as a contractor instead of as an employee on his position description, thereby violating the District of Columbia Workplace Fraud Act ("WFA").  Compl. ¶¶ 118–26. Defendants argue, among other things, that the WFA applies only to employees in the construction industry.  *See* Defs.' Mem. at 30.  And, indeed, the statute clearly states that, under the WFA, "'[e]mployee' means every person . . . providing *construction services* to another person."  D.C. Code § 32-1331.01(2) (emphasis added).  The WFA also states that it "shall apply only to the construction services industry."  *Id.* § 32-1331.02.

Dr. Coulibaly makes no assertions in his complaint about having ever served as an employee in the construction industry.  *See* Compl. ¶¶ 118–26.  Nor is there any evidence in the record to suggest that he ever did.  *Cf.* Position Description, Defs.' Facts Ex. F, at 3–4, ECF No. 30-6 (stating that Dr. Coulibaly's major duties while working for the Department of State included "teaching speaking, reading, listening comprehension and writing . . . skills to a full range of students" and "provid[ing] major substantive input for the planning, design, development and evaluation of the course content").  Because the record in this case shows no dispute about the fact that Dr. Coulibaly never provided construction services while working for the Department of State, the Court must find, as a matter of law, that the WFA does not apply to Dr. Coulibaly.  The Court accordingly cannot hear his claim and will therefore enter judgment for Defendants on Count 12 of his complaint.

2. Whistleblower Protection Act

Count 17 of Dr. Coulibaly's complaint alleges that, because he was terminated for attempting to expose an inappropriate relationship between Director Blake and a colleague, his

termination violated the District of Columbia Whistleblower Protection Act.  Compl. ¶¶ 165–176.

Defendants correctly argue that the Act applies to only current and former District of Columbia

government employees.  *See* Defs.' Mem. 31–32.  The Act defines "employee" to include only

(1) former or current District of Columbia government employees and (2) applicants for

employment by the District of Columbia government.  *See* D.C. Code § 1-615.52(a)(3).

Moreover, the Act prohibits only "supervisors" from taking prohibited personnel actions because

of an employee's whistleblowing activities—and it defines "supervisors" to include only

individuals "employed by the District [of Columbia] government."  *Id.* §§ 1-615.52(a)(8),

1-615.53(a).  And though Dr. Coulibaly asserts that the Act covers federal agencies because it

defines "public body" to include federal agencies, *see* Compl. ¶ 171 (quoting D.C. Code

§ 1-615.52(a)(7)(C)), the Act merely includes federal agencies within the set of bodies to which

District of Columbia government employees may make protected whistleblowing disclosure.

*See* D.C. Code § 1-615.52(a)(6) (defining protected whistleblowing disclosures as including

disclosures of information "made by a supervisor or a public body"); *cf. id.* § 1-615.53 (imposing

prohibitions on "supervisors," but not on "public bodies").  The District of Columbia

Whistleblower Protection Act thus applies only to District of Columbia government employees

and to District of Columbia government employers.  *Contra* Pl.'s Resp. ¶ 442.

In this case, no evidence in the record suggests that Dr. Coulibaly is or ever was a District

of Columbia government employee.  *Cf., e.g.*, Position Description, Defs.' Facts Ex. F, ECF

No. 30-6 (showing that the United States Department of State, not the District of Columbia

government, employed Dr. Coulibaly).  Nor does Dr. Coulibaly assert that his supervisors were

District of Columbia government employees.  *See* Compl. ¶¶ 165–76; *cf., e.g.*, Fyfe Aff. ¶ Q1,

Defs.' Facts Ex. H, ECF No. 30-8 (stating that LTS Fyfe was an FSI employee within the

Department of State, not a District of Columbia government employee).  Thus, because the Act's statutory language offers a right of action to only current or former District of Columbia government employees asserting claims against District of Columbia government employee-supervisors, Dr. Coulibaly cannot file suit under the District of Columbia Whistleblower Protection Act.[52]  The Court will therefore grant Defendants' motion for summary judgment with respect to Count 17 of Dr. Coulibaly's complaint.

### G.  Motion for Leave to File a Fourth Amended Complaint

Having addressed the merits of the parties' arguments with respect to Defendants' motion, the Court now turns to the remaining motions pending in this case.  With respect to Dr. Coulibaly's motion for leave to file a fourth amended complaint, *see* Pl.'s Resp., the Court observes that many counts of Dr. Coulibaly's proposed amended complaint duplicate counts in the current complaint that the Court deems cannot proceed.  *See, e.g.*, Pl.'s Resp. ¶¶ 287–368, 371–74, 425–37, 440–42, 449–74, 482–512, 515–33.  Given this fact, the Court takes note of the principle that "[a]n amendment would be futile if it merely restates the same facts as the original complaint in different terms, reasserts a claim on which the court previously ruled, fails to state a legal theory, or could not withstand a motion to dismiss."  *Robinson v. Detroit News, Inc.*, 211 F. Supp. 2d 101, 114 (D.D.C. 2002).  In light of the Court's rulings today, much of Dr. Coulibaly's proposed amended complaint is futile, and it would accordingly be inappropriate for the Court to grant his motion to amend the existing complaint.  Furthermore, the Court observes that some of

---

[52] The Court notes that Dr. Coulibaly has pursued similar claims under the *federal* Whistleblower Protection Act.  *See* Pet. for Review at 1–2, *Coulibaly v. Dep't of State*, No. 16-1156 (D.C. Cir. May 24, 2016) (seeking review of the Office of Special Counsel's closure of his whistleblower retaliation allegations).

Dr. Coulibaly's claims are based on entirely unrelated facts and on distinct legal theories.  *See, e.g.*, Pl.'s Resp. ¶¶ 534–40 (asserting Freedom of Information Act claims).

Because of these characteristics of Dr. Coulibaly's proposed amended complaint, the fact that this litigation has been pending for two years now, and the fact that the complaint currently governing this litigation already contains hundreds of paragraphs, granting Dr. Coulibaly's motion to amend his complaint would unnecessarily delay proceedings in this action. The Court will accordingly deny Dr. Coulibaly's motion for leave to file a fourth amended complaint.  *See Harris v. Sec'y, U.S. Dep't of Veterans Affairs*, 126 F.3d 339, 344 (D.C. Cir. 1997) (explaining that, in deciding whether to allow a party to amend a complaint, courts may consider "undue delay . . . , undue prejudice to the opposing party . . . , [and] futility of amendment" (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962))).

### H.  Motion to Add Newly Acquired Evidence

Lastly, Dr. Coulibaly requests that the Court admit newly acquired evidence in the form of a letter from Dr. Coulibaly's attending psychiatrist, Dr. Rajendra Lowtan.  *See* Pl.'s Mot. Add Newly Acquired Evidence, ECF No. 39.  Because Defendants consent to this submission, the Court will grant Dr. Coulibaly's motion and admit the document into the record.  *See* Defs.' Resp. Pl.'s Mot. Add Newly Acquired Evidence, ECF No. 44.

Dr. Coulibaly has also requested that the Court seal this document.  *See* Pl.'s Resp. ¶ 40. Because Defendants have not opposed this request, *see* Defs.' Reply, and because individuals have a privacy interest in "the intimate details" of their lives, *see United States v. Hubbard*, 650 F.2d 293, 324 (D.C. Cir. 1980), the Court will grant Dr. Coulibaly's request.

### IV.  CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss or in the alternative for summary judgment (ECF No. 30) is **GRANTED IN PART** and **DENIED IN PART**, Dr. Coulibaly's motion for leave to file a fourth amended complaint (ECF No. 36) is **DENIED**, and Dr. Coulibaly's motion to include newly acquired evidence (ECF No. 39) is **GRANTED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  September 30, 2016                              RUDOLPH CONTRERAS
                                                        United States District Judge